Geaham, Judge,
delivered the opinion of the court:
On the 30th of April, 1918, the plaintiff executed a contract with the defendant for grading a certain piece of ground, erecting buildings thereon, and constructing roads for an extension to the Naval Training Camp at Cape May, N. J. The specifications upon which plaintiff made its bid contained a contour map of the ground and most of the items and conditions of the contract, particularly the provisions with reference to changes in specifications and extras.
This suit grows out of claims by plaintiff for expenditures occasioned by changes in the specifications, extras, and damages for delays in the delivery of lumber and the conduct of the inspector. The facts are fully set forth in the findings.
In March, 1918, before executing the contract, plaintiff’s engineer made an inspection of the site, having with him a copy of the contour map. At that time he did not discover any errors therein. On or about April 25 another representative of plaintiff, a consulting engineer, made an inspection of the ground and found that the contour map was grossly in error, as to elevations and in other particulars. On April 30 plaintiff had a correct survey made of the site. The conditions were therefore known to the plaintiff before it executed the contract, and consequently it could not have been misled. There could, therefore, be no question of warranty.
After execution of the contract by agreement between the parties the said survey made by plaintiff’s engineer was accepted in place of the contour map attached to the specifications as representing the true condition of the ground, and the work was proceeded with in accordance with that survey, which required much more time and labor than would have been required under the original contour map attached to *681 the specifications. There were changes also made in the construction of the buildings in connection with which the plaintiff did extra work.
Section 11 of the specifications contains the following provision as to changes:
“ The Government reserves the right to make such changes in the contract, plans, and specifications as may be deemed necessary or advisable, and the contractor agrees to proceed with such changes as directed in writing by the Chief of the Bureau of Yards and Docks. The cost of said changes shall be estimated by the officer in charge, and, if less than $500, shall be ascertained by him. If the cost of said changes is $500 or more, as estimated by the officer in charge, the same shall be ascertained by a boai*d of not less than three officers or other representatives of the Government. The cost of the changes as ascertained above, when approved by the Chief of the Bureau of Yards and Docks, shall be added to or deducted from the contract price, and the contractor agrees and consents that the contract price thus increased or decreased shall be accepted in full satisfaction for all work done under the contract: Provided, That the increased cost shall be the estimated actual cost to the contractor at the time of such estimate and that the decreased cost shall be the actual or market value at the time the contract was made, both plus a profit of 10 per cent.”
The following provision as to extras is contained in section 18 of the specifications:
“ The contract price shall cover all expenses, of whatever nature or description, connected with the work to be done under the contract. Should the contractor at any time consider that he is being required to furnish any material or labor not called for by the contract, a written itemized claim for compensation therefor must be submitted by him to the officer in charge, who will refer the same at once with full report and recommendation to the Navy Department, Bureau of Yards and Docks, for decision and formal order covering approved items, if any. The failure or neglect of the contractor to present as above his claim for material or labor alleged to be extra within 60 days after being required to furnish or perform the same shall be deemed and construed as a waiver of all claim and right to additional compensation for the furnishing or performance of the alleged extra material or labor, and the contractor agrees to accept *682 the finding and action of the Navy Department, Bureau of Yards and Docks, in the premises as conclusive and binding.”
The contract required the work to be completed in 90 days from April 80, 1918. In April, 1919, the work had not been completed. On March 18, 1919, plaintiff presented to defendant a claim for reimbursement for loss covering twenty-five different items. Some of these losses, as stated, grew out of changes in the specifications, some were caused by extra work, and others were due to delays in delivery of lumber and to the conduct of the inspector. The claim was referred to a board of three representatives of the Government, who made a report thereon, recommending allowances on some of the items and rejecting others. This report was submitted to the Bureau of Yards and Docks, and some time after March 12, 1920, the acting chief of that bureau disapproved certain items and approved others, the total amount of the latter being $7,562.12.
The specifications provided that the additional cost of the changes as ascertained by the board should be added to the contract price “ when approved by the Chief of the Bureau of Yards and Docks.” This makes the approval of the latter official necessary in order to establish the claim; and until this approval had been secured the original price for the performance of the contract could neither be increased nor decreased by reason of the changes made in the specifications. Plaintiff could only, recover, therefore, for such items as were approved by said official, and, as set out in Finding XXY, the total amount of these items, $7,562.12, was paid to plaintiff. .Whether the action of the Acting Chief of the Bureau of Yards and Docks was right is not for us to inquire. The plaintiff in its contract agreed to an adjustment of its claims by the said bureau and is bound by the contract. We have only to construe and enforce it as we find it.
As to the items claimed as “ extras,” the contract provides that the finding and action of the Navy Department, through the Bureau of Yards and Docks, in approving or disapproving the contract “ shall be conclusive and binding.” That bureau approved some of plaintiff’s claims and disapproved *683 others, and its action is conclusive and binding upon the court.
The next question is the claim for delay in delivery of the lumber, the rejection of the lumber by the inspector and his conduct otherwise, and delays growing out of interference with the work.
As to the lumber, it does not appear whether the delays were due to the fault of the party who was to supply the lumber, inability to secure shipment, or delay in shipment. It is admitted that there was delay in some instances of as much as six weeks. However, the defendant can not be held liable for these delays. The contract contained the following provision:
“ Fifth. It is understood and declared to be the meaning of the first clause of paragraph 2 of said Addendum No. 1A that the party of the second part will arrange' with the lumber director of the War Industries Board for the party of the first part to purchase the lumber required for the work hereunder, f. o. b. mills, at the prices named in the schedule of lumber prices attached to said Addendum No. 1A. Said schedule of lumber prices is attached hereto and forms a part of this contract.”
and Addendum No. 1A mentioned therein is as follows:
“ The contractor may use in preparing his bid the attached list of lumber prices furnished by the lumber director of Haw Materials Division of War Industries Board. In case these prices are used and the Government receives the benefit of them in the lump-sum bid, the Government will arrange with the lumber director of War Industries Board to furnish the contractor by shipment direct from the mills the lumber required at the prices named in the schedule of prices attached hereto.
“ In using these prices, which are f. o. b. mills, the contractor may assume that the average freight rate from the Georgia-Florida territory to Cape May, N. J., is 27 cents per hundred, which would amount to approximately $7.50 per thousand, no adjustment, however, in contract price on account of freight rates will be made.
“The successful bidder in order to avail himself of the Government lumber prices shall make an affidavit that his bid was based thereon.”
*684 It will be seen from this that the Government simply agreed to arrange for the plaintiff to purchase the lumber at the prices named in the schedule, provided the Government received the benefit of the lump-sum bid on the contract. There was a lump-sum bid and the Government did arrange, through the War Industries Board, for the purchase by plaintiff of the lumber required for the contract at the contract prices. Plaintiff purchased the lumber and was under obligation to pay for it. It took its chances as to prompt delivery just as it would have had it purchased the lumber from any other source.
The facts are that on April 19 plaintiff’s representatives came to Washington, saw the project manager of the Bureau of Yards and Bocks, and presented him with a list of lumber required for the work. He took plaintiff’s representatives to the lumber director of the War Industries Board, who told them that they would have to get the lumber from the Alabama-Mississippi Emergency Lumber Bureau, as he could not place the order with the Georgia-Florida Bureau, and that he would have to change the grades on the list. Thereupon in the presence of plaintiff’s representatives he and the representative of the Bureau of Yards and Bocks made the necessary changes. The lumber director then referred plaintiff’s representatives to the Washington representative of the Alabama-Mississippi Emergency Lumber Bureau, who received the revised list and said he would place the order with the mills in two days, about April 21, 1918, and that the lumber would be shipped within five days thereafter. Whatever delay there was was clearly not due to any act of the Government, through the Navy Be-partment, or the Bureau of Yards and Bocks, for which it was responsible under the contract. It agreed to arrange for the purchase of the lumber by plaintiff at the prices named in the contract, and this it did. Apparently the plaintiff was satisfied with the situation growing out of the changes. It does not appear that it made any objection or protest, and with full knowledge of the changed conditions executed the contract. The claim for damages by reason of this delay can not be allowed.
*685 As to the delays caused by the action of the inspector, it has been difficult to reach a conclusion, owing to the number and character of the acts from which the plaintiff is claimed to have suffered loss. In some cases the inspector was within the defendant’s rights as fixed by the contract. Paragraph 26 of the specifications provides for inspection and gives the officer a very broad discretion. He is given power to reject materials and workmanship not in accord with the contract, and the plaintiff is required to promptly remove all such rejections and replace them to the satisfaction of the officer without extra cost to the Government. However, the conduct of the inspector in some respects was captious, unreasonable, and not due to the exercise of the spirit and discretion which were contemplated in the discharge of his duties, by reason of which plaintiff suffered loss for which it should be compensated. This loss has been fixed by the findings at $4,306.22.
As shown in Finding XXIX, the comptroller allowed an item of $252.23 for extra work, and this sum was paid to the plaintiff. This claim had been previously disallowed by the Bureau of Yards and Docks, whose decision under the contract must be held to be controlling. The action of the comptroller is not conclusive upon this court in determining the rights of the parties. See Penn Bridge Co. v. United States, 59 C. Cls. 892, 896. The sum stated should be charged off against the allowance made to the plaintiff.
By a stipulation filed it is admitted that the plaintiff is indebted to the United States in the sum of $2,405.93, which should be deducted from the sum allowed here.
The plaintiff is entitled to recover $4,306.22 by reason of the conduct of the inspector. From this should be deducted , the amount of its indebtedness to the United States, $2,405.93, and also the sum of $252.23 allowed by the Comptroller General, a total deduction of $2,658.16, leaving a balance of $1,648.06, for which judgment should be entered in favor of plaintiff, and it is so ordered.
Moss, Judge; Hat, Judge; Booth, Judge; and Campbell, Chief Justice, concur.