# S&E CONTRACTORS, INC. *v.* UNITED STATES

No. 70–88.   Argued October 21, 1971—Reargued March 20, 1972—
Decided April 24, 1972

1

2

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which BURGER, C. J., and STEWART and POWELL, JJ., joined, *post*, p. 19. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 23. REHNQUIST, J., took no part in the consideration or decision of the case.

*Geoffrey Creyke, Jr.,* reargued the cause for petitioner. With him on the briefs was *John P. Wiese.*

*Irving Jaffe* reargued the cause for the United States. On the brief were *Solicitor General Griswold, Assistant Attorney General Gray, Samuel Huntington,* and *Walter H. Fleischer.*

Briefs of *amici curiae* urging reversal were filed by *Edward L. Wright, Beverly C. Moore, F. Trowbridge vom Baur, Overton A. Currie, Marshall J. Doke, Jr., Gilbert A. Cuneo, George M. Coburn, Eldon H. Crowell,* and *John A. McWhorter* for the American Bar Association, and by *Harold C. Petrowitz, pro se.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question presented in this case is whether the Department of Justice may challenge the finality of a contract disputes decision made by the Atomic Energy Commission (AEC) in favor of its contractor, where the contract provides that the decision of AEC shall be "final

and conclusive." Section 1 of the Wunderlich Act leaves open for contest a claim that "is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." [1]

Moreover, 41 U. S. C. § 322, provides that "[n]o government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

The Department of Justice challenged the settlement made by the AEC on two grounds, (1) that the decision was "not supported by substantial evidence" and (2) that it was "erroneous as a matter of law."

But the disputes clause in the contract [2] says that the decision of the AEC is "final and conclusive," unless

---

[1] The Wunderlich Act, 68 Stat. 81, provides:

"No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U. S. C. § 321.

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." 41 U. S. C. § 322.

[2] The contract provided:

"6. *Disputes*

"(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within

a court determines that the award is vulnerable under §§ 1 and 2 of the Act. There is no federal statute which submits disputes of this character to review by one or more administrative agencies, where as here there is no charge of fraud or bad faith. Nor is there a statute which enables another federal agency to contest in court the validity of the decision of the AEC, absent fraud or bad faith.

In plain lay language the question then is whether, absent fraud or bad faith, the contractor can rely on the ruling of the federal agency with which it made the contract or can be forced to go through still another tier of federal review. We hold that absent fraud or bad faith the federal agency's settlement under the disputes clause is binding on the Government; that there is not another tier of administrative review; and that, save for fraud or bad faith, the decision of AEC is "final and conclusive," it being for these purposes the Federal Government. We reverse the judgment of the Court of Claims.

---

30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Commission. The decision of the Commission or its duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

"(b) This 'Disputes' Clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above; Provided, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

## I

On August 4, 1961, petitioner contracted with the AEC to build a testing facility at the National Reactor Test Station in Idaho. The work was completed and accepted by the AEC on June 29, 1962. Because of various changes in contract specifications and difficulties in meeting performance schedules, petitioner submitted a series of claims to the contracting officer for resolution under the standard disputes clause contained in the contract, asking for equitable modifications of the contract and additional compensation. On August 8 and November 8, 1962, the contracting officer approved some of the claims and disapproved others, and the petitioner sought review of the adverse decisions with the AEC.

Since it did not then have a contract appeals board,[3] the Commission referred petitioner's appeal to a hearing examiner, before whom an adversary hearing was held. On June 26, 1963, the examiner decided in favor of eight of petitioner's claims and remanded the dispute to the contracting officer for negotiations to determine the exact amount due petitioner. 2 A. E. C. 631. The contracting officer then sought review of this decision by the Commission. See 10 CFR § 2.760 (Jan. 1, 1963).

The Commission declined to review four of the claims, 2 A. E. C. 738, which had the effect of sustaining the examiner's decision on them. 10 CFR § 2.762 (a) (Jan. 1, 1963). Included within this group was the examiner's determination that amounts due petitioner could not be retained to offset claims allegedly owed by petitioner to other contractors and other agencies of government. The

---

[3] The Atomic Energy Commission Board of Contract Appeals was not established until 1964. See 10 CFR § 3.1 et seq. (Jan. 1, 1971).

Commission modified the examiner's decision on three of the remaining claims and reversed him on the last, which petitioner has since abandoned. It "remanded to the contracting officer with instructions to proceed to final settlement or decision in accordance with the decision of the hearing examiner dated June 26, 1963, as modified by [its] order of November 14, 1963, and by [that] decision." 2 A. E. C. 850, 856.

On March 6, 1964, prior to the AEC's final ruling but after it had upheld the examiner's decision on the "retainage" claim, a certifying officer of the Commission requested the opinion of the General Accounting Office on whether a voucher for the retainage claim could be certified for payment. Jurisdiction for the Comptroller General's review was purportedly founded upon 31 U. S. C. § 82d.[4] After some 33 months of what amounted to a plenary review of the proceedings before the examiner, the Comptroller General concluded that the voucher could not be certified for payment. 46 Comp. Gen. 441. On March 27, 1967, the AEC wrote petitioner, saying, "The Atomic Energy Commission's view is that S&E Contractors, Inc. has exhausted its administrative recourse to the Commission. The Commission will take no action, in connection with the claims, inconsistent with the views expressed by the Comptroller General . . . ." The petitioner then brought this action in the Court of Claims seeking a judgment of $1.95 million and an order remanding the case for negotiations on the time extension

---

[4] Volume 55 Stat. 876, 31 U. S. C. § 82d provides:

"The liability of certifying officers or employees shall be enforced in the same manner and to the same extent as now provided by law with respect to enforcement of the liability of disbursing and other accountable officers; and they shall have the right to apply for and obtain a decision by the Comptroller General on any question of law involved in a payment on any vouchers presented to them for certification."

to which it claimed it was entitled under the AEC's original decision.

The defenses tendered raised no issue of any fraud or bad faith of the contractor against the United States.

On cross-motions for summary judgment, a commissioner of the Court of Claims ruled in favor of petitioner, holding that the General Accounting Office lacked authority to review the decision of the AEC and that the AEC's refusal to follow its own decisions favorable to petitioner was a breach of the disputes clause of the contract. On review by the Court of Claims, however, that decision was reversed by a four-to-three vote. While the majority acknowledged "that the Comptroller General effectively stopped payment of the claims," it did not pass upon the legality of that action. 193 Ct. Cl. 335, 340, 433 F. 2d 1373, 1375. Reasoning, instead, that the Wunderlich Act allowed both the Department of Justice and contractors an equal right to judicial review of administrative decisions and that the AEC's refusal to abide by its earlier decision was a permissible means of obtaining this review, it remanded petitioner's claims "to the commissioner for his consideration and report on the various claims under Wunderlich Act standards." *Id.*, at 351, 433 F. 2d, at 1381.

The Commissioner did not base his opinion on any issue of fraud or bad faith of the contractor against the United States, nor did the Court of Claims. The case is now here on a petition for writ of certiorari which we granted. 402 U. S. 971.

Petitioner argues that neither the text nor the legislative history of the Wunderlich Act supports the right of the United States to seek judicial review of an administrative decision on a contractual dispute, that the General Accounting Office was without statutory or contractual authority to overturn the AEC's decision, and that the

AEC should not be allowed to abandon after some 33 months its own decision that had been made in petitioner's favor. In response, the Solicitor General contends that the Wunderlich Act does give the Department of Justice the right of judicial review of contract decisions made by federal administrative agencies and that the Department of Justice is free to assert whatever defenses it desires in the Court of Claims without regard to the earlier actions of the federal contracting agency.

## II

The disputes clause included in Government contracts is intended, absent fraud or bad faith, to provide a quick and efficient administrative remedy and to avoid "vexatious and expensive and, to the contractor oftentimes, ruinous litigation." *Kihlberg* v. *United States,* 97 U. S. 398, 401 (1878). The contractor has ceded his right to seek immediate judicial redress for his grievances and has contractually bound himself to "proceed diligently with the performance of the contract" during the disputes process. The purpose of avoiding "vexatious litigation" would not be served, however, by substituting the action of officials acting in derogation of the contract.[5]

The result in some cases might be sheer disaster. In the present case nearly a decade has passed since petitioner completed the performance of a contract under which the only agency empowered to act determined that it was entitled to payment. To postpone payment for such a period is to sanction precisely the sort of "vexatious litigation" which the disputes process was designed to avoid.

---

[5] The American Bar Association, as *amicus curiae,* notes "that the contractor's consent to permit a specific representative of the Government to decide disputes—the Commission—should not be read as permitting any different representative of the Government to 'veto' decisions rendered by the Commission which are in favor of the contractor."

Here, petitioner contracted with the United States acting through the AEC and it was exclusively with this Commission that the administrative resolution of disputes rested. Disputes initially were to be resolved between the contractor and the contracting officer and, if a settlement satisfactory to the contractor could be reached at that level, no review would lie.[6] See *United States* v. *Mason & Hanger Co.*, 260 U. S. 323; *United States* v. *Corliss Steam-Engine Co.*, 91 U. S. 321.

By the disputes clause[7] the decision of the AEC is "final and conclusive" unless "a court of competent jurisdiction" decides otherwise for the enumerated reasons. Neither the Wunderlich Act nor the disputes clause empowers any other administrative agency to have a veto of the AEC's "final" decision or authority to review it. Nor does any other Act of Congress, except where fraud or bad faith is involved, give any other part of the Executive Branch authority to submit the matter to any court for determination. In other words, we cannot infer that by some legerdemain the disputes clause submitted the dispute to further administrative challenge or approval,[8] and did not mean what it says when it made

---

[6] While the quoted language from paragraph 6 (a) of the contract concerns factual disputes and while questions of law are dealt with in paragraph 6 (b) (see n. 2, *supra*), there is no reason to believe that the two clauses should not be considered *in pari materia* or that a different avenue for review should apply to legal questions than to those of fact. Indeed, paragraph 6 (b) speaks of "consideration of law questions *in connection with decisions provided for in paragraph (a)*." (Emphasis added.) The difference between the two clauses relates only to the standard of reviewability and does not establish separate avenues of review.

[7] See n. 2, *supra*.

[8] For certain types of fraud against the Government, Congress has vested the General Accounting Office with investigative powers. In the case of kickbacks by Government contractors, for example, "the General Accounting Office shall have the power to inspect the

the AEC's decision "final and conclusive." See *United States* v. *Mason & Hanger Co., supra,* at 326. Kipps, The Right of the Government to Have Judicial Review of a Board of Contract Appeals Decision Made Under the Disputes Clause, 2 Pub. Contract L. J. 286 (1969); Schultz, Wunderlich Revisited: New Limits on Judicial Review of Administrative Determination of Government Contract Disputes, 29 Law & Contemp. Prob. 115, 132–133 (1964).

A citizen has the right to expect fair dealing from his government, see *Vitarelli* v. *Seaton,* 359 U. S. 535, and this entails in the present context treating the government as a unit rather than as an amalgam of separate entities. Here, the AEC spoke for the United States and its decision, absent fraud or bad faith, should be honored. Cf. *NLRB* v. *Nash-Finch Co.,* 404 U. S. 138.

Since the AEC withheld payment solely because of the views of the Comptroller General and since he had been given no authority to function as another tier of administrative review, there was no valid reason for the AEC not to settle with petitioner according to its earlier decision. For that purpose the AEC was the United States. Cf. *Small Business Administration* v. *McClellan,* 364 U. S. 446, 449.

The cases deny review by the Comptroller General of administrative disputes clause decisions as "without legal authority" absent fraud or overreaching. *E. g., McShain Co.* v. *United States,* 83 Ct. Cl. 405, 409 (1936). In

---

plants and to audit the books and records of any prime contractor or subcontractor engaged in the performance of a negotiated contract," 74 Stat. 741, 41 U. S. C. § 53, and criminal penalties are provided if a violation is established. 41 U. S. C. § 54.

If the Comptroller General has the broad, roving, investigatory powers that are asserted, specific statutory grants of authority such as this provision relating to kickbacks would be superfluous.

*James Graham Mfg. Co.* v. *United States,* 91 F. Supp. 715 (ND Cal. 1950), for example, the contracting agency had determined that the contractor was entitled to reimbursement for certain expenditures under two cost-plus-fee contracts, but the Comptroller General refused payment. While the court noted the "extensive and broad" powers of the Comptroller General, it held that, absent instances of "fraud or overreaching," where the Comptroller General's power was founded upon specific statutory provisions such as 41 U. S. C. § 53, he had no "authority to determine the propriety of contract payments" approved by the contracting agency. 91 F. Supp., at 716. Accordingly, summary judgment was entered by the court, which said, "Since the Navy Department has determined that plaintiff contractor is entitled to the payment sought, this Court must adjudge accordingly." *Id.,* at 717.

Congress contemplated giving the General Accounting Office such powers and, indeed, the Senate twice passed— in the form of the McCarran bill—a provision which would have allowed the Comptroller to review disputes decisions to determine if they were "fraudulent, grossly erroneous, so mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence." S. 24, 83d Cong., 1st Sess. (1953). "If enacted, it would [have] invest[ed] the GAO with the power—which it has never had—to upset an administrative decision which it [found] 'grossly erroneous' or 'not supported by reliable, probative, and substantial evidence.'" Schultz, Proposed Changes in Government Contract Disputes Settlement: The Legislative Battle over the Wunderlich Case, 67 Harv. L. Rev. 217, 243 (1953). The House of Representatives rejected this provision, however, and the Wunderlich Act was ultimately passed in its present form. We cannot, therefore, construe

it to give the Comptroller General powers which Congress has plainly denied.

It is suggested, however, that the Comptroller General's power is not one of review over the AEC decision but is merely the power "to force the contractor to bring suit and thus to obtain judicial review for the Government." The disputes clause, however, sets forth the administrative means for resolving contractual disputes. Under the present contract the AEC is the final administrative arbiter of such claims and nowhere is there a provision for oversight by the Comptroller General. The Comptroller General, however, conducted a 33-month *de novo* review of the AEC proceedings; he blocked the payment to which the AEC determined petitioner was entitled; and he placed upon petitioner the burden of going to the Court of Claims to receive that payment. That action by the Comptroller General was a form of additional administrative oversight foreclosed by the disputes clause.

### III

A majority of the Court of Claims held "that the Government has the right to the same extent as the contractor to seek judicial review of an unfavorable administrative decision on a contract claim." 193 Ct. Cl., at 346, 433 F. 2d, at 1378. The Solicitor General adopts this view and sees in the Attorney General's obligation to conduct litigation on behalf of the United States, 28 U. S. C. §§ 516, 519, the power to overturn decisions of coordinate offices of the Executive Department.

The Attorney General has the duty to "conduct . . . litigation in which the United States, an agency, or officer thereof is a party," 28 U. S. C. § 516, and to "supervise all [such] litigation," 28 U. S. C. § 519. That power is pervasive but it does not appear how under the Wunderlich Act it gives the Department of Justice the right to appeal from a decision of the Atomic

Energy Commission. Normally, where the responsibility for rendering a decision is vested in a coordinate branch of Government, the duty of the Department of Justice is to implement that decision and not to repudiate it. See 39 Op. Atty. Gen. 67, 68 (1937); 38 Op. Atty. Gen. 149, 150 (1934); 25 Op. Atty. Gen. 524, 529 (1905); 25 Op. Atty. Gen. 93, 96 (1903); 20 Op. Atty. Gen. 711, 713 (1894); 20 Op. Atty. Gen. 270, 272 (1891); 17 Op. Atty. Gen. 332, 333 (1882). Indeed, this view of the role of the Department of Justice may be traced back to William Wirt, the first of our Attorneys General to keep detailed records of his tenure in office. "Wirt it was who first recorded the propositions that the Attorney General does not decide questions of fact, that the Attorney General does not sit as an arbitrator in disputes between the government departments and private individuals nor as a reviewing officer to hear appeals from the decisions of public officers . . . ." H. Cummings & C. McFarland, Federal Justice 84 (1937) (footnotes omitted).

The power to appeal to the Court of Claims a decision of the federal agency under a disputes clause in a contract which the agency is authorized to make is not to be found in the Wunderlich Act and its underlying legislative history.[9] That Act was designed to overturn our

---

[9] It has been said that the Act's legislative history "has something for everyone." Kipps, The Right of the Government to Have Judicial Review of a Board of Contract Appeals Decision Made Under the Disputes Clause, 2 Pub. Contract L. J. 286, 295 (1969). Suffice it to say we find the Act's history at best ambiguous. In construing laws we have been extremely wary of testimony before committee hearings and of debates on the floor of Congress save for precise analyses of statutory phrases by the sponsors of the proposed laws. See generally *NLRB* v. *Fruit Packers,* 377 U. S. 58, 66 (1964); *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 288 (1956); *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, 394–395 (1951); *United States* v. *St. Paul, M. & M. R. Co.,* 247 U. S. 310, 318 (1918); *Omaha*

decision in *United States* v. *Wunderlich,* 342 U. S. 98
(1951), which had closed the courthouse doors to certain
citizens aggrieved by administrative action amounting to
something less than fraud. See S. Rep. No. 32, 83d
Cong., 1st Sess.; H. R. Rep. No. 1380, 83d Cong., 2d
Sess. It should not be construed to require a citizen to
perform the Herculean task of beheading the Hydra in
order to obtain justice from his Government.

We are reluctant to construe a statute enacted to free
citizens from a form of administrative tyranny so as to
subject them to additional bureaucratic oversight, where
there is no evidence of fraud or overreaching. In this
connection, it should be noted that committee reports
accompanying the Wunderlich Act indicate that judicial
review was provided so that contractors would not inflate
their bids to take into account the uncertainties of ad-
ministrative action.[10] This objective would be ill served

---

*& Council Bluffs Street R. Co.* v. *ICC,* 230 U. S. 324, 333 (1913);
*United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 318
(1897).

The reason is the *caveat* of Mr. Justice Holmes, "We do not
inquire what the legislature meant; we ask only what the statute
means." The Theory of Legal Interpretation, 12 Harv. L. Rev. 417,
419.

[10] The House Report stated, "A continuation of this situation [cre-
ated by the *Wunderlich* decision] will render the performance of
Government work less attractive to the responsible industries upon
whom the Government must rely for the performance of such work,
and will adversely affect the free and competitive nature of such
work. It will discourage the more responsible element of every in-
dustry from engaging in Government work and will attract more
speculative elements whose bids will contain contingent allowances
intended to protect them from unconscionable decisions of Govern-
ment officials rendered during the performance of their contracts."
H. R. Rep. No. 1380, 83d Cong., 2d Sess., 4.

In a similar vein, the Senate Report on the Senate version of the
Wunderlich Act stated, "The impact of this decision on the many
business firms who, in a condition of expanding production with
respect to the defense of the United States, must deal with many

if Government contractors—having won a favorable decision before the agencies with whom they contracted—had also to run the gantlet of the General Accounting Office and the Department of Justice.

## IV

A contractor's fraud is of course a wholly different genus than the case now before us. Even where the contractor has obtained a judgment and the time for review of it has expired, fraud on an administrative agency or on the court enforcing the agency action is ground for setting aside the judgment. "[S]etting aside the judgment to permit a new trial, altering the terms of the judgment, or restraining the beneficiaries of the judgment from taking any benefit whatever from it," *Hazel-Atlas Co.* v. *Hartford Co.,* 322 U. S. 238, 245, are the usual forms of relief which have been granted. Patents obtained with unclean hands and contracts that are based on those patents are similarly tainted and will not be enforced. *Precision Co.* v. *Automotive Co.,* 324 U. S. 806. Contracts with the United States—like patents—are matters concerning far more than the interest of the adverse parties; they entail the public interest:

> "[W]here a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public." *Id.,* at 815.

of the Government departments in Government construction and defense materials, was one that could only cause great expense to the United States in that the contractors would be forced to puff up their bids so as to be sure of sufficient funds to provide for unforeseen contingencies." S. Rep. No. 32, 83d Cong., 1st Sess., 2.

Congress has made elaborate provisions for dealing with fraudulent claims of contractors. Where the Comptroller General is convinced "that any settlement was induced by fraud," he is directed to "certify . . . all the facts . . . to the Department of Justice, to the Administrator of General Services, and to the contracting agency concerned." 58 Stat. 664, as amended, 41 U. S. C. § 116 (b). The Administrator of General Services is also given broad powers of investigation and he is directed to give the Department of Justice "any information received by him indicating any fraudulent practices, for appropriate action." 41 U. S. C. § 118 (d). Moreover, whenever "any contracting agency or the Administrator of General Services believes that any settlement was induced by fraud," the facts shall be reported to the Department of Justice. 41 U. S. C. § 118 (e). And the Department of Justice is given broad powers to act. *Ibid.* In addition, Congress has imposed severe penalties on contractors who commit fraudulent acts and it has given the federal courts power to hear and determine such cases. 41 U. S. C. § 119.

Broad, flexible civil remedies are also provided against those who "use or engage in . . . an agreement, combination, or conspiracy to use or engage in or to cause to be used or engaged in, any fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any payment, property, or other benefits from the United States or any Federal agency in connection with the procurement, transfer, or disposition of property . . . ." 63 Stat. 392, 40 U. S. C. § 489 (b).

As to the Court of Claims, 28 U. S. C. § 2514 provides that: "A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

"In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture." [11]

These statutory provisions show that, apart from the inherent power of courts to deal with fraud, the Department of Justice indubitably has standing to appear or intervene at any time in any appropriate court to restrain enforcement of contracts with the United States based on fraud. See, *e. g., United States* v. *Hougham,* 364 U. S. 310 (1960); *Rex Trailer Co.* v. *United States,* 350 U. S. 148 (1956); *United States* v. *Dinerstein,* 362 F. 2d 852 (CA2 1966).

So far as the Wunderlich Act is concerned, it is irrelevant whether the administrative agency deciding this dispute is the AEC or the AEC's board of contract appeals. It was common in the beginning to give final authority over the resolution of disputes under a Government contract to the designated contracting officer, save for "fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment." *Kihlberg* v. *United States,* 97 U. S., at 402. Later came the present boards of contract appeals.

Boards of contract appeals within the respective agencies today are common. They are not statutory creations but are established by administrative regulations. S. Doc. No. 99, 89th Cong., 2d Sess., Operation and Effectiveness of Government Boards of Contract Appeals 20–21. Their decisions "constitute administrative

---

[11] Where the Department of Justice has successfully asserted this defense of fraud, the Court of Claims has disallowed contractors' claims. See, *e. g., Kamen Soap Products Co.* v. *United States,* 129 Ct. Cl. 619, 124 F. Supp. 608 (1954) (fraudulent preparation of evidence); *Morris Demolition Corp.* v. *United States,* 99 Ct. Cl. 336 (1943); *Jerman* v. *United States,* 96 Ct. Cl. 540 (1942) (fraudulent invoices); *Mervin Contracting Corp.* v. *United States,* 94 Ct. Cl. 81 (1941) (false payroll vouchers); *Atlantic Contracting Co.* v. *United States,* 57 Ct. Cl. 185 (1922) (embezzlement).

adjudication in its purest sense." *Id.*, at 21. As noted,[12] the AEC has had a board of contract appeals since 1964. Boards of contract appeals were in effect long before the Wunderlich Act and that explains why the Act provides for review "of any decision of the head of any department or agency or *his duly authorized representative or board.*" 41 U. S. C. § 321 (emphasis added).

We held in *United States* v. *Bianchi & Co.*, 373 U. S. 709, that even where the decision on review in the Court of Claims is that of a board of contract appeals, the review must be on the administrative record and that no trial *de novo* may be held. That decision led to proposals in Congress that, in effect, rulings of contract appeals boards be denied finality.[13] S. Doc. No. 99, *supra*, at 25–26 and n. 70. But Congress has not taken that step. Some have urged that where a decision of a board of contract appeals is involved, the United States should have standing to appeal to the Court of Claims. *Id.*, at 159. But our leading authority on these problems, Professor Harold C. Petrowitz, who wrote S. Doc. No. 99, *supra*, observed, "This has never been done, and the procedure may appear anomalous in view of the relatively close relationship between boards and the agencies they serve." *Ibid.* However serious the problem may be and whatever its dimensions, it is obviously one for the Congress to resolve, not for us to resolve within the limits of the Wunderlich Act.

This case does not involve the situation where an administrative agency, upon timely petition for rehearing or prompt *sua sponte* reconsideration, determines that its earlier decision was wrong and, for that reason, refuses

---

[12] See n. 3, *supra*. And see 29 Fed. Reg. 12829 *et seq.*

[13] For other aspects of exhaustion of administrative review of decisions from boards of contract appeals, see *United States* v. *Moorman*, 338 U. S. 457; *United States* v. *Grace & Sons*, 384 U. S. 424; *United States* v. *Utah Construction Co.*, 384 U. S. 394.

to abide by it. The AEC has not, to this day, repudiated the merits of its decisions in favor of petitioner. Nor, to repeat, is this a case of a fraud of a contractor against the United States. This is simply an instance where a contractor successfully resolved its disputes with the agency with which it had contracted and to whom that power had been delegated. The fruits of petitioner's labors were frustrated, however, by the intermeddling of another agency without power to act and, when petitioner sought enforcement of its rights in court, still another agency of the Government entered and sought to disavow the decision made here by the AEC.

If the General Accounting Office or the Department of Justice is to be an ombudsman reviewing each and every decision rendered by the coordinate branches of the Government, that mandate should come from Congress, not from this Court.

The judgment of the Court of Claims is

*Reversed.*


MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE POWELL join, concurring.

Because I agree that in this case, where neither fraud nor bad faith is charged, the Wunderlich Act, 41 U. S. C. §§ 321–322, does not operate to give the United States the power to challenge a contract disputes clause finding of fact in favor of the contractor by the Government's own contracting agency, I join the Court's opinion and its judgment. I venture some supportive comments:

1. The contracting officer and the Atomic Energy Commission acted here in an executive capacity for the United

States. See *Small Business Administration* v. *McClellan*, 364 U. S. 446, 448–450 (1960). The Commission is the party to the contract with the contractor. Its exercise of executive judgment is necessarily that of the United States. Yet the Government, by its position here, would grant itself the right to challenge its own executive determination whenever the General Accounting Office, by interposition, thinks this should be done. This, for me, does not make good sense and, in the absence of clear congressional authorization, I doubt that it would make good law.

2. The disputes clause in Government contracts has been employed for over four decades. The clause is one drawn and prescribed by the United States. It is not one drawn by the contractor or by any group of contractors with whom the United States deals. And for years, with the specified exceptions, that clause itself has been regarded as conferring no right of judicial review on the part of the Government.

3. By accepting the disputes clause in his contract, the contractor bears the interim financial burden and gives up the right of rescission and the right to sue for damages. What he receives in return is the Government's assurances of speedy settlement and of prompt payment, not payment delayed for months or, as here, for years.

4. To compel a contractor to go through the administrative process and to proceed and to perform with less than his usual arsenal of defenses against administrative arbitrariness or unfairness, and then to have that determination submitted to judicial review at the behest of still another agency of Government, subjects the contractor to untoward delay in payment and to a financial hazard that may well prove to be ruinous.

5. The result would be a strange one if, as even the GAO here concedes, a contracting officer's decision favorable to a contractor possesses finality, *United States* v. *Corliss*

*Steam-Engine Co.,* 91 U. S. 321 (1876); *United States v. Mason & Hanger Co.,* 260 U. S. 323 (1922), while a decision at the higher level of the agency itself does not. When the officer and the contractor agree to the disposition of a dispute, there is no occasion for the issuance of a decision by the contracting officer, and the Wunderlich Act, by its terms, does not apply. And if the contractor accepts a decision of the contracting officer, and does not appeal to the Commission, that decision, by the specific provisions of the disputes clause, is final and conclusive as to questions of fact. Under the Government's position, however, the decision at the agency head would enjoy no such preferred and conclusive status.*

6. Lurking in the background of the Court's decision is advantage to the Government resulting from what strikes me as a possible breach of contract. The contractor here, according to the long-term understanding of the disputes clause, consented to the disposition of disputes by the contracting officer and by the AEC on appeal, and to the finality of decision at those points. It did not

---

*Judge Collins, dissenting in the Court of Claims, says it well:

"When a dispute arises between a contractor and the Government, the 'disputes' clause sets out clearly the procedure to be followed. First, the parties may voluntarily settle the dispute. If they do, that is the end of the matter. If no settlement is reached, the disputed matters are decided by the agency's contracting officer. If the contractor does not appeal to the agency from the contracting officer's decision within the prescribed time, that, again, is the end of the matter. If, however, the contractor does appeal to the agency, then, according to the court, a decision rendered by the agency or its board favorable to the contractor is not the end of the matter; the agency is free at any time to disavow or repudiate its own decision, thereby forcing the contractor to sue. The anomaly created by the court's decision is too obvious to need elaboration. While an agency will still be bound by the decisions of its contracting officers, it will not be bound by decisions made at the highest level." 193 Ct. Cl. 335, 379–380, 433 F. 2d 1373, 1397–1398. (Footnotes omitted.)

consent to its review or to the exercise of veto power by any other agency of Government. When the United States then disavows the Commission's decision—a decision that, as the Court notes, to this day has never been withdrawn or repudiated by the AEC—it seems to me that the Government imposes something to which the contractor has not agreed.

7. The legislative history, which the dissent finds so clearly supportive of its conclusion, is not at all that clear for me. I doubt if anyone who reads and absorbs the Appendix to the dissent's opinion will find it clear and indicative. I regard it, as does the Court and as did the dissenters in the Court of Claims, as decidedly ambiguous at best. Even the Court of Claims majority struggled with the history and conceded that it did not "explicitly" provide for Government-instituted judicial review. 193 Ct. Cl. 335, 342, 433 F. 2d 1373, 1376. This is not surprising, for the Wunderlich Act was intended to relieve contractors from the holding in *United States* v. *Wunderlich,* 342 U. S. 98 (1951), where the Court restricted contractor-instigated judicial review to the situation of alleged and proved fraud. In *Wunderlich* the Government sought to reinstate an Interior Secretary's fact decision, favorable to the Government and adverse to the contractor, which the Court of Claims had set aside as "arbitrary," "capricious," and "grossly erroneous." The Government there urged—and prevailed over three dissenting votes—a narrow judicial review standard for the contractor. Congress reacted, and the Wunderlich Act overrode this restrictive measure of review and opened the door to the contractor to the extent permitted by the proviso clause of § 321.

I am not able to read into this legislative change a corresponding nod in the direction of the Government. The flat rejection by Congress of the proposed provision for GAO review is significant. There would be no point

in that rejection if GAO has the power to defeat the finality of the disputes decision anyway. And the differing approaches taken on this appeal by the Department of Justice and the GAO themselves indicate the inconclusiveness of the legislative history.

8. The issue is not whether advantage is or is not to be taken of the Government. Of course, the Government's rights are to be protected. That protection, however, is afforded by the nature and workings of the contract disputes system, by its emphasis on expeditious performance and getting the job done, and by the presence of the contracting officer and the agency, but not of the GAO. This results in fulfillment of the contract and, at the same time, gives the contractor the protection he needs against fraud, capriciousness, arbitrariness, bad faith, and absence of evidence. In the exercise of its legislative judgment, Congress has determined that in this area the Government needs no more.

I therefore join in reversing the judgment of the Court of Claims and in giving this contractor the benefit of the decision made by the Atomic Energy Commission itself, the very agency that was the contractor's opposite party to the contract.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

This is a suit by petitioner against the United States to recover on a contract between petitioner and the Atomic Energy Commission. The contract included a "disputes clause," which provided that the Commission would decide any factual disputes that arose under the contract and that its decision would "be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence."

The disputes clause also provided that while it did "not preclude consideration of law questions in connection with [disputes] decisions," it was not to "be construed as making final the [Commission's] decision . . . on a question of law." Disputes arose during performance of the contract, and the Commission decided them in petitioner's favor. The General Accounting Office, however, when rendering an advisory opinion requested on behalf of the Commission as to one of the disputed items, disagreed with the Commission's decision, and for that reason the Commission refused to pay. In petitioner's subsequent suit in the Court of Claims, petitioner relied upon the Commission's decision as a "final and conclusive" resolution of the disputes, entitling petitioner to summary judgment. The Department of Justice defended the suit on the grounds that the Commission's decision was not supported by substantial evidence and was erroneous on questions of law. The issue before us is whether the Government, through the Department of Justice, may assert those defenses.

It may be helpful at the outset to put this case in perspective by reviewing briefly the law developed over the past century to regulate the enforcement of disputes clauses in Government procurement contracts. Until 1954, with the passage of the Wunderlich Act, disputes clauses provided that the decision of a designated Government official upon a matter in dispute under the contract would be final and binding upon both parties. Although in terms the disputes clauses precluded judicial review of disputes decisions, this Court beginning in 1878 consistently held that the finality of a disputes decision could be challenged in court by either party on the ground of fraud or bad faith by the deciding Government official. Thus the "fraud" exception to the finality of disputes decisions was not written into disputes clauses but was judicially fashioned.

Under this system, then, a contractor dissatisfied with an adverse disputes decision could contest the finality of that decision only by proving in court that it was fraudulent. The Government, of course, bore an identical burden when it contested the finality of a disputes decision in favor of the contractor. That situation arose when GAO, congressional watchdog of Government expenditures, refused to sanction payment to a contractor of the amount found due under a disputes decision in his favor and thereby forced him to bring suit. GAO's view of the disputes decision, however, was of no consequence in court; indeed, whether or not the Government defended the contractor's suit was a matter solely for the judgment of the Government's lawyer, the Department of Justice. Once in court, the contractor relied upon the finality of the disputes decision and recovered on that basis unless the Government proved that the decision was fraudulent.

Over the years, the Court of Claims gradually broadened the fraud exception to the finality of disputes decisions. In 1951, however, this Court stopped the trend by holding that a disputes decision, rendered pursuant to a disputes clause purporting to make that decision final, was conclusive upon both parties unless the challenger proved in court that the deciding Government official was guilty of "conscious wrongdoing, an intention to cheat or be dishonest." *United States* v. *Wunderlich,* 342 U. S. 98, 100 (1951). *Wunderlich's* narrow definition of the fraud exception alarmed the Government as well as contractors, for, in practical effect, it meant that disputes decisions were virtually invulnerable to challenge.

The result of this concern was the so-called Wunderlich Act, drafted by GAO and supported by GAO, Government procurement agencies, and contractors. The Act overruled *Wunderlich* by directing that no disputes clause, purporting to make disputes decisions final, "shall

be pleaded in any suit . . . as limiting judicial review of any [disputes] decision to cases where fraud by [the Government] official . . . is alleged." The Act did more than simply overrule *Wunderlich*, however, for it also explicitly stated the grounds upon which courts could set aside disputes decisions: "any [disputes] decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." Finally, the Act provided that "[n]o Government contract shall contain a provision making final on a question of law the decision of any [Government] official . . . ."

The Wunderlich Act, then, rendered the old forms of disputes clauses unserviceable, for no longer could the parties bind themselves to the finality of a disputes decision, judicially reviewable only if the challenger proved that it was fraudulent. Consequently, the disputes clause in the contract before us did not even attempt to provide for the finality of the Commission's disputes decisions, but instead expressly tracked the language of the Act. Under this disputes clause and the Act, the party dissatisfied with a disputes decision is no longer limited to challenging the finality of that decision only on the ground that it was "fraudulent," for the dissatisfied party is now entitled also to prove in court that the decision was "capricious," "arbitrary," "so grossly erroneous as necessarily to imply bad faith," "not supported by substantial evidence," or incorrect "on a question of law." In this case, the Government relied upon the last two grounds to challenge the finality of the Commission's disputes decision in favor of petitioner.[1]

---

[1] The concurring opinion seems to read the judicial-review provision out of the disputes clause: "And if the contractor accepts a decision of the contracting officer, and does not appeal to the Commission, that decision, by the *specific provisions* of the dis-

As noted above, under pre-Wunderlich Act disputes clauses, which purported to make disputes decisions final, the Government, like the contractor, could avail itself of the judicially created fraud exception to the finality of disputes decisions. The Government obtained judicial review when GAO refused to sanction payment after a disputes decision in favor of the contractor, thus forcing him to bring a suit in which the Department of Justice represented the Government. That was precisely the path followed in this case, for GAO, in response to a request for an advisory opinion, informed the Commission that payment would be improper because the disputes decision did not meet the standards of the Wunderlich Act, and, in petitioner's subsequent suit, the Department of Justice represented the Government. Had this case arisen under earlier forms of disputes clauses, which purported to make disputes decisions final, and before the Wunderlich Act, the Government could have defended the suit only on the judicially created ground that the disputes decision was fraudulent. Under the current clause and the Act,

---

putes clause, is final and conclusive as to questions of fact. Under the Government's position, however, the decision at the agency head would enjoy no such preferred and conclusive status." *Ante,* at 21 (emphasis added). The Commission's disputes decision does not have "conclusive status" under the disputes clause, of course, because of a "specific provision" of the clause. That provision directs that the Commission's decision is "final and conclusive *unless*" (emphasis added) a court determines that it was "fraudulent," etc. It does *not* direct that the Commission's decision is final and conclusive unless the *contractor appeals* to the courts. That is the language of the earlier provision, referred to by the concurring opinion, under which the contracting officer's decision is final and conclusive unless the *contractor appeals* to the Commission. If "the specific provisions of the disputes clause" apply after the contracting officer's decision, surely they also apply after the Commission's decision.

however, the Government is not limited to that narrow ground. Like the contractor, the Government may now also rely upon any or all of the other grounds enumerated in the clause and the Act. The Commission's disputes decision is not "final and conclusive," under the clause and the Act, if the Court of Claims determines, as the Government asserted here, that the decision was "not supported by substantial evidence" or was incorrect "on a question of law." [2]

Yet the Court today holds that the Government has no right to defend petitioner's suit. Had the Commission's disputes decision been adverse to petitioner, of course, petitioner would have been free to challenge its finality in court, under the disputes clause and the Act, on the grounds that it was "not supported by substantial evidence" and was incorrect "on a question of law." The Court holds, however, that the Government may not challenge the finality of the disputes decision in favor of petitioner because the Government, under the disputes clause and the Act, has no right to judicial review of disputes decisions. [3] The Court reaches this

---

[2] The Court's opening sentence appears to say that we are dealing with a pre-Wunderlich Act disputes clause that "provides that the decision of AEC shall be 'final and conclusive.'" *Ante,* at 2–3. The Court later recognizes the obvious: "By the Disputes Clause the decision of AEC is 'final and conclusive' unless 'a court of competent jurisdiction' decides otherwise for the enumerated reasons." *Id.,* at 9.

[3] It was suggested at oral argument that the procurement agency might pay the contractor in accordance with a disputes decision in his favor and that subsequently, prompted by GAO's post-audit, the Department of Justice might sue the contractor to recoup the payment on the ground that the agency's decision was improper under the disputes clause and the Wunderlich Act. The Court's holding today, of course, prohibits the Government from obtaining judicial review of disputes decisions by that method. Indeed, that would be an *a fortiori* case, for the agency not only would have decided in favor of the contractor, but also would have paid him in accord-

conclusion on the strength of its assertions that GAO had no business exercising its statutory authority and advising the Commission that the disputes decision was erroneous, that the Department of Justice had no business exercising its statutory authority and appearing in the Court of Claims to defend petitioner's suit, and that the Government is always entitled to relief if the contractor perpetrates a fraud. Noticeably absent from the Court's opinion is any justification for interpreting the disputes clause and the Act to apply only when a disputes decision is adverse to the contractor. Somehow the Court construes a contract and a statute that bar finality for *all* disputes decisions to require finality for disputes decisions in favor of contractors.

Today's decision is demonstrably wrong. The Court holds that Congress enacted the Wunderlich Act for the benefit of contractors, to arm them with grounds in addition to fraud to challenge in court the finality of disputes decisions unfavorable to them. Yet, without an iota of support in the language of the Act, which expressly governs "any" disputes decision in "any suit," or in the Act's legislative history, which confirms that the expanded grounds of judicial review were to be available to both the Government and contractors, the Court holds that the Government, unlike contractors, may not rely upon the Act to challenge in court the finality of disputes decisions. Indeed, the Court goes further, for, as noted, the disputes clause before us did not purport to make the Commission's disputes decisions final. The Court thus holds that the Act denies the Government the privilege of entering into a contract that affords it as well as the contractor the right to judicial review of disputes decisions. Hence, while the

ance with its decision. If a disputes decision is final when the agency refuses to implement it by payment, certainly it is final when the agency pays.

Act ensures that contractors are entitled to judicial review even when the disputes clause provides for finality, the Act also, according to the Court, ensures that the Government is denied judicial review even when the disputes clause does not provide for finality. Today's decision produces the absurd result that when the Government agreed to a disputes clause with no provision for judicial review, it could nevertheless challenge the finality of a disputes decision at least for fraud, but now that the Government has agreed to a disputes clause specifying five grounds of judicial review, including fraud, it is entitled, holds the Court, to none at all.[4] The Government's position is thus worse than it was before the Act, for it is deprived of even the limited review for fraud to which it was entitled under *Wunderlich.* Finally, the Act flatly prohibits disputes clauses that make disputes decisions final on questions of law. The clause before us, following the Act, expressly pro-

---

[4] The Court's constant repetition of the phrase "fraud or bad faith" might suggest to the casual reader that the Court is holding that the Government may challenge the finality of disputes decisions on those grounds. That, however, is not true, for fraud and bad faith are two of the grounds specified in the disputes clause and the Wunderlich Act: a disputes decision may be set aside if it is "fraudulent" or if it is "so grossly erroneous as necessarily to imply bad faith." In contrast to the disputes clause and the Act, the Court is not referring to disputes decisions resulting from the fraud or bad faith of the *disputes decisionmaker.* Rather the Court is referring to fraud or bad faith on the part of the *contractor,* as the Court's statement of facts makes clear: "The defenses tendered raised no issue of any fraud or bad faith of the contractor against the United States." *Ante,* at 7. "The Commissioner did not base his opinion on any issue of fraud or bad faith of the contractor against the United States, nor did the Court of Claims." *Ibid.* See also *id.,* at 9–10, n. 8 and Part IV of the Court's opinion. The concurring opinion also refers to "fraud" and "bad faith." *Ante,* at 19. Again, however, the reference is not to fraud and bad faith as used in the disputes clause and the Act.

vided that the Commission's disputes decisions could not be final on questions of law. Yet, in the face of the Act and the disputes clause, the Court holds that the Commission's decision is final on questions of law.

Analysis of the judicial history of disputes clauses, both in this Court and in the Court of Claims, will unfortunately unduly extend the length of this opinion. But the devastation today's decision wreaks upon Government procurement practices is sufficient justification, and Congress should be alert to the urgent need for immediate remedial legislation. Congress alone can restore the former balance between Government and contractor, for today's decision not only holds that the Act's expanded scope of judicial review is available solely for contractors, but also holds that the Act, in some unspecified way, prohibits the contracting parties from agreeing to a disputes clause that affords the Government that same scope of review. Congress must therefore make more explicit what is already explicit in the Wunderlich Act, but this time in terms so plain that even this Court will be unable to thwart the congressional will.

## I

### A

The contract in *Kihlberg* v. *United States,* 97 U. S. 398 (1878), as the Court construed it, provided that the decision of a designated Government official would be "conclusive." The official rendered a decision adverse to the contractor, and the contractor brought suit. Because there was "neither allegation nor proof of fraud or bad faith" by the official, the Court held that his decision could not "be subjected to the revisory power of the courts without doing violence to the plain words of the contract." *Id.,* at 401. The Court then enunciated the standard of judicial review that has been the

basis for the decision of every subsequent disputes clause
case, both in this Court and in the Court of Claims:
"in the absence of fraud or such gross mistake as would
necessarily imply bad faith, or a failure to exercise an
honest judgment, his action in the premises is conclusive
upon the [contractor] *as well as upon the government."*
*Id.,* at 402 (emphasis added).

The very first case in this Court, then, laid down the
rule that a decision rendered pursuant to a disputes
clause was equally binding upon *both* parties; the con-
tractor and the Government could impeach a disputes
decision that the contract purported to make final, but
only by proving that the decision was fraudulent. Until
today, this Court never departed from the *Kihlberg* view
that the same standard of judicial review is available
to both parties.

*Sweeney* v. *United States,* 109 U. S. 618 (1883), reiter-
ated the *Kihlberg* rule in another suit by a contractor
dissatisfied with a disputes decision rendered by a Gov-
ernment official. Because "there was neither fraud, nor
such gross mistake as would necessarily imply bad faith,
nor any failure to exercise an honest judgment on the
part of the officer," the Court held, "on the authority of
*Kihlberg* v. *United States,"* that the official's decision
was conclusive. *Id.,* at 620.

The Court next decided three cases involving contracts
between private parties. In *Martinsburg & Potomac R.
Co.* v. *March,* 114 U. S. 549 (1885), a contractor agreed
to do certain work for a railroad company, and the con-
tract provided that disputes would be decided by a
company official whose decision would be "final and
conclusive." *Id.,* at 553. The official's decision was in
favor of the company, and the contractor brought suit.
The Court, stating that the "case is within the prin-
ciples announced in *Kihlberg* v. *United States* and

*Sweeney* v. *United States,"* *id.,* at 550 (here, and in subsequent similar quotations, citations not repeated), held that the official's decision was conclusive because there was no proof that he "had been guilty of fraud, or had made such gross mistake in his estimates as necessarily implied bad faith, or had failed to exercise an honest judgment in discharging the duty imposed upon him," *id.,* at 553.

The contract in *Chicago, S. F. & C. R. Co.* v. *Price,* 138 U. S. 185 (1891), was essentially the same as the contract in *March.* In *Price,* however, the official's disputes decision was in favor of the contractor. The company refused to pay in accordance with the decision, and the contractor brought suit. The Court first reviewed *March* and stressed that *March* had applied "the principles announced in *Kihlberg* v. *United States* and *Sweeney* v. *United States." Id.,* at 193. The Court then pointed out that "[t]he only difference between that case [*March*] and the present one is that the alleged mistakes of the engineer in the former were favorable to the railroad company, while in this case they are favorable to the contractors." *Id.,* at 194. "[T]hat difference," said the Court, "cannot affect the interpretation of the contract." *Ibid.* Because there was no proof of "fraud upon the part of the company's engineers, or such gross mistakes by them as imply bad faith," the Court held that the disputes decision was binding upon the company. *Id.,* at 195.

*Price* thus established that the party whose employee was delegated authority to make the disputes decision could also challenge the finality of that decision, although, like the contractor, only under the *Kihlberg* test of fraud. The Court reaffirmed this application of the *Kihlberg* rule in *Sheffield & Birmingham Coal, Iron & R. Co.* v. *Gordon,* 151 U. S. 285 (1894), holding that

"in the absence of fraud or mistake" by the company official, his decision in favor of the contractor "was conclusive upon the company." *Id.*, at 292.

*United States* v. *Gleason*, 175 U. S. 588 (1900), involved a Government official's disputes decision adverse to the contractor. The Court again affirmed the rule of *Kihlberg* and the intervening cases

> "that it is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer, or other officer, of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that, in the absence of fraud or of mistake so gross as to necessarily imply bad faith, such decision will not be subjected to the revisory power of the courts. *Martinsburg & Potomac Railroad* v. *March; Chicago, Sante Fé &c. Railroad* v. *Price.*" *Id.*, at 602.

The Court also followed the *Kihlberg* rule in *Ripley* v. *United States*, 223 U. S. 695, 701–702, 704 (1912), and *Merrill-Ruckgaber Co.* v. *United States*, 241 U. S. 387 (1916).

In *United States* v. *Mason & Hanger Co.*, 260 U. S. 323 (1922), the contractor was paid in accordance with a disputes decision in his favor, but the Comptroller of the Treasury disagreed with the decision and subsequently deducted the amount paid from other sums due the contractor. *Id.*, at 325. The contractor brought suit, relying upon the finality of the disputes decision. The Court's holding was direct and simple:

> "We have decided that the parties to the contract can so provide and that the decision of the officer is conclusive upon the parties. *Kihlberg* v. *United States; Martinsburg & Potomac R. R. Co.* v. *March;*

*United States* v. *Gleason; Ripley* v. *United States.* This is extending the rule between private parties to the Government." *Id.,* at 326.

*Mason & Hanger,* then, applied the *Kihlberg* rule when the contractor in a Government contract *relied* upon the disputes decision by a Government official and the *Government* challenged it. Hence, *both* parties to a Government contract, like both parties to a private contract, as in *Price* and *Gordon,* were free to challenge the finality of a disputes decision, although only upon the limited grounds permissible under *Kihlberg.*

*Mason & Hanger* also held that "the Comptroller of the Treasury has no power" over a disputes decision, 260 U. S., at 326, meaning that his disagreement with the decision was irrelevant and had no effect in court, where the parties' rights under the contract were determined. The Government, like the contractor, could prevail only by proving that the disputes decision was fraudulent. The Comptroller's authority was limited to his power to refuse to sanction payment to the contractor, thereby forcing the contractor to bring suit for a judicial determination of his right to payment in accordance with the disputes decision in his favor.[5]

In sum, the rule first announced in *Kihlberg* in 1878 had, with *Mason & Hanger* in 1922, been held to apply to any disputes decision, whether in a Government or in a private contract, and to apply no matter which party relied upon the finality of the decision. If the Government (or, in a private contract, the party whose official decided the dispute) relied upon the finality of the decision, the contractor had to prove that it was fraudulent. *Kihlberg; Sweeney; March; Gleason.* If

---

[5] The Court's citation of *Mason & Hanger, ante,* at 10, is, to say the least, perplexing.

the contractor relied upon the finality of the decision, the Government (or, in a private contract, the party whose official decided the dispute) had to prove that it was fraudulent. *Price; Gordon; Mason & Hanger.*[6]

In *United States* v. *Moorman,* 338 U. S. 457 (1950), the Court once again gave extended consideration to the proper judicial interpretation of disputes clauses. The Court pointed out that "[c]ontractual provisions such as these have long been used by the Government. No congressional enactment condemns their creation or enforcement." *Id.,* at 460. The Court then reviewed *Kihlberg, Sweeney,* and *March,* and said that "[t]he holdings of the foregoing cases have never been departed from by this Court. They stand for the principle that parties competent to make contracts are also competent to make such agreements." *Id.,* at 461. The Court added that "[i]f parties competent to decide for themselves are to be deprived of the privilege of making such anticipatory provisions for settlement of disputes, this deprivation should come from the legislative branch of government." *Id.,* at 462.

Finally, came *United States* v. *Wunderlich,* 342 U. S. 98 (1951). The contract contained the usual disputes clause providing that the disputes decision was "final and conclusive." *Id.,* at 99. After noting that the

---

[6] *Goltra* v. *Weeks,* 271 U. S. 536 (1926), which involved a contractor's challenge to the finality of a disputes decision by a Government official, also demonstrates that the rule was the same no matter which party challenged the decision. The Court there held that the official's decision was binding "unless there is an absence of good faith in the exercise of the judgment." *Id.,* at 548. Significantly, the Court cited as authority, not only *Kihlberg, Sweeney, March,* and *Gleason,* all cases in which the contractor challenged and the Government (in *March,* the party whose official decided the dispute) relied upon the disputes decision, but also *Mason & Hanger,* in which the Government challenged the finality of a disputes decision upon which the contractor relied.

same disputes clause had been upheld in *Moorman,* the Court stated:

"Contracts, both governmental and private, have been before this Court in several cases in which provisions equivalent to [this disputes clause] have been approved and enforced 'in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment . . . .' *Kihlberg* v. *United States; Sweeney* v. *United States; Martinsburg & P. R. Co.* v. *March; Chicago, S. F. & C. R. Co.* v. *Price."* *Id.,* at 99–100.

We thus have an unbroken line of cases in this Court, from 1878 to 1951, applying a simple, straightforward rule of judicial review. A contractual disputes clause making final a decision by an agent of one of the parties was given full effect in court, subject to the judicially created exception that allowed relief to the party challenging the decision if he was able to prove that it was fraudulent. This rule applied whether the contract was Government or private and no matter which party challenged the finality of the decision. In short, a disputes clause was *equally* binding upon both parties.

### B

Most disputes clause cases, of course, have been decided not by this Court but by the Court of Claims. That court followed the *Kihlberg* rule when a contractor challenged a disputes decision against him, see, *e. g., Kennedy* v. *United States,* 24 Ct. Cl. 122 (1889); *P. H. McLaughlin & Co.* v. *United States,* 37 Ct. Cl. 150 (1902); *Pacific Hardware Co.* v. *United States,* 49 Ct. Cl. 327 (1914); *Brinck* v. *United States,* 53 Ct. Cl. 170 (1918); *Southern Shipyard Corp.* v. *United States,* 76 Ct. Cl. 468 (1932), as well as when the Government challenged a disputes decision in the contractor's favor.

In *Pacific Hardware, supra,* the contract provided that a Government official would deduct specified amounts from the contract price if the contractor delayed in performing the contract. Deductions were made, and the contractor brought suit. The court applied the *Kihlberg* rule and upheld the deductions. 49 Ct. Cl., at 336. The contract also provided that the official could waive deductions under certain circumstances. The contractor argued that this power violated public policy and therefore vitiated the contract. The court rejected the argument, but added that the power to decide in favor of the contractor by waiving deductions, like the power to decide against the contractor by making deductions, was subject to the *Kihlberg* rule:

> "Of course, if there were fraud or such gross error as implies bad faith or a failure to exercise an honest judgment in deciding that the deductions be not made, the Government would not be bound and the contractor would remain liable." *Id.,* at 337.

In *Yale & Towne Mfg. Co.* v. *United States,* 58 Ct. Cl. 633 (1923), the disputes decision was in favor of the contractor, but the Government refused to pay because the Comptroller of the Treasury disagreed with the decision. The contractor argued "that the contract reposed in the contracting officer . . . the right to determine whether or not and the extent to which the contractor was entitled to extension of time, and that the finding of that officer was conclusive upon the parties in the absence of fraud or mistakes so gross as to imply bad faith." *Id.,* at 637.

The court, noting "that a long line of decisions not only by this court but by the Supreme Court requires the sustaining of the [contractor's] contention," stated:

> "Provisions in Government contracts reposing in some designated official the right to determine cer-

tain questions and making his determination thereof conclusive are of frequent occurrence. Such provisions are inserted largely for the protection of the Government, and the cases in which such a determination by the designated official has been upheld by the courts have been largely cases in which the rule has been invoked in favor of the United States and against the [contractor], *but the rule is none the less effective if perchance it occasionally may operate the other way." Id.,* at 638 (emphasis added).

In *Penn Bridge Co.* v. *United States,* 59 Ct. Cl. 892 (1924), the disputes decision was in favor of the contractor, but the Comptroller General disagreed with the decision and deducted the amount from other sums due the contractor. The Court, referring to the Comptroller's attempt to "substitute his judgment for that of the contracting officer and thereby eliminate from the case the finding of the contracting officer when the rights of the parties are in this court for adjudication," *id.,* at 898, stated that "action by the comptroller could [not] in any way conclude this court in the determination of the rights of the parties under the contract," *id.,* at 896. The court then applied the *Kihlberg* rule. *Id.,* at 897.

*Penn Bridge,* then, aside from reaffirming that the same rule of judicial review applied whether the Government or the contractor challenged the finality of a disputes decision, also demonstrates that GAO's view of the correctness of a disputes decision was of no effect in court. GAO's only power—the power of the purse—was to force the contractor to bring suit and thus to obtain judicial review for the Government. But once the case reached court, review was the same for both parties.

GAO's opinion of a disputes decision was irrelevant in court even when GAO favored the contractor. In

*Eaton, Brown & Simpson, Inc.* v. *United States,* 62 Ct. Cl. 668 (1926), the disputes decision was in favor of the Government, but the Comptroller General disagreed and paid the contractor. In the contractor's suit to recover on other claims, the court held that the disputes decision controlled and deducted the amount GAO had paid from other sums due the contractor. "The action of the comptroller is not conclusive upon this court in determining the rights of the parties. See *Penn Bridge Co.* v. *United States." Id.,* at 685.

In *Carroll* v. *United States,* 76 Ct. Cl. 103 (1932), the Comptroller General disagreed with a disputes decision in favor of the contractor and assessed damages in a sum greater than the amount due under the contract. The contractor brought suit, and the Government argued that it was entitled to the excess. The court replied:

> "The issue is not a new or novel one insofar as judicial precedents are concerned. At least beginning with the case of *Kihlberg* v. *United States* to the present time, the Supreme Court has uniformly held that in Government contracts containing provisions similar to the one in suit, the parties are competent to bind themselves to the conclusiveness and finality of the action and findings of the department with which the contract is made, and that such action is not open to the supervisory power of the courts unless overturned by proof of fraud or such gross error as to warrant the implication of fraud." *Id.,* at 124–125.

In *Albina Marine Iron Works* v. *United States,* 79 Ct. Cl. 714 (1934), the disputes decision was in the contractor's favor, but the Comptroller General disagreed and assessed damages. The court held that the disputes decision

> "was a final disposition of the matter. Neither

fraud nor bad faith is alleged or proven. The court cannot go behind the decision of the contracting officer where the contract makes him the final arbiter of the facts of the case unless there has been fraud or such gross error which, in effect, would imply bad faith. The cases in this court and the Supreme Court so holding are numerous." *Id.*, at 720.

After repeating that it could not review the disputes decision "without the establishment of fraud or such gross error which would imply bad faith," the court concluded:

"It is seldom that a case arises like the instant case, where the contractor is upholding the decision of the contracting officer and the Government is attempting to overthrow the decision of the officer appointed and designated by it to contract and carry out the terms of the undertaking. Unless proven to the contrary, full faith and credit should be accorded an officer of the Government in arriving at a decision which requires fair and impartial action on his part." *Id.*, at 721.

In *McShain Co.* v. *United States*, 83 Ct. Cl. 405 (1936), the designated Government official decided that the contractor's delay in completing the contract was unavoidable. The Comptroller General later decided that part of the delay was the contractor's fault and deducted damages from the amount due under the contract. The contractor brought suit, relying upon the finality of the disputes decision. The court said:

"Neither fraud nor bad faith is alleged or proven. This court and the Supreme Court by numerous decisions have held there is no going behind the decision of the contracting officer when the contract provides that 'his finding of facts therein shall be final and conclusive on the parties thereto.' The action of the Comptroller General was without

legal authority. *Kihlberg* v. *United States; United States* v. *Gleason." Id.,* at 409.[7]

In *B-W Construction Co.* v. *United States,* 97 Ct. Cl. 92 (1942), the Comptroller General deducted damages for delay after a disputes decision in the contractor's favor. The court held that because of the disputes clause "[i]t is . . . the action of the head of the department that is before us for review. On the question now before us that action is binding on us unless we find that it was arbitrary or grossly erroneous. In no event are we bound under this contract by the action of the Comptroller General." *Id.,* at 123.

In *Mitchell Canneries* v. *United States,* 111 Ct. Cl. 228, 77 F. Supp. 498 (1948), the Comptroller General disagreed with a disputes decision in favor of the contractor and set off that amount against other sums due the contractor on other contracts. The court applied "[t]he established principle of law that the findings of fact of a contracting officer are binding upon both the Government and the contractor if there is no fraud, gross error or arbitrariness by the contracting officer amounting to bad faith." *Id.,* at 247, 77 F. Supp., at 502.

These Court of Claims cases are further cogent authority that the Government was, until today, entitled to exactly the same judicial review as contractors. A disputes clause providing for a final decision by a Govern-

---

[7] The Court cites *McShain Co.* for the proposition that "[t]he cases deny review" by GAO "absent fraud or overreaching." *Ante,* at 10. Since *McShain Co.* is simply another example of the application of the *Kihlberg* rule against the Government, I am at a loss to understand the Court's statement. As the excerpt I have quoted in the text demonstrates, *McShain Co.* did not "deny review" by GAO; rather, like the other cases, it held that GAO's view of the merits of the disputes decision was irrelevant in court and that the Government could upset the finality of that decision only by proving in court that it was fraudulent.

ment official was equally binding upon both parties. GAO's opinion of that decision was irrelevant in court. GAO's only power was to refuse to sanction payment under a disputes decision favorable to a contractor and thereby compel the contractor to bring suit. Once in court, the standard of review applicable to contractor challenges likewise controlled the Government's challenge.

The district courts reached the identical result. In *James Graham Mfg. Co.* v. *United States,* 91 F. Supp. 715 (ND Cal. 1950), the Comptroller General refused to accept a disputes decision in favor of the contractor. Although the agency adhered to the merits of its decision, it refused to pay because of the Comptroller's contrary view. The court said:

> "Another officer of the United States government, the Comptroller General, who has general control of the government's purse strings, has refused to sanction payment of the account which the Navy Department has approved. The question . . . is: Has he power to determine that payment shall not be made?
>
> "The powers of the Comptroller General are extensive and broad. But he does not, absent fraud or overreaching, have authority to determine the propriety of contract payments when the contracts themselves vest the final power of determination in the contracting executive department. United States v. Mason & Hanger Co.; United States v. Moorman." *Id.,* at 716.[8]

---

[8] The Court states, *ante,* at 11, that the District Court in *James Graham,* by referring to "fraud or overreaching," referred to instances "where the Comptroller General's power was founded upon specific statutory provisions such as 41 U. S. C. § 53," a statute relating to "kickbacks by Government contractors," *id.,* at 9 n. 8. In

In *Consolidated Vultee Aircraft Corp.* v. *United States,*
97 F. Supp. 948 (Del. 1951), the contractor received an
adverse disputes decision from the contracting officer
but won reversal on appeal to the agency. GAO dis-
agreed with the agency's decision and refused to pay,
forcing the contractor to bring suit. The court held
for the contractor on the authority of *Mason & Hanger,
Penn Bridge,* and *James Graham. Id.,* at 951.

## C

The law was thus crystal clear. The district courts,
the Court of Claims, and this Court consistently applied
the rule, originally announced almost a century ago in
*Kihlberg,* that contractual clauses providing for the
finality of disputes decisions rendered by an employee
of one of the parties were enforceable in court, with
the judicially created exception for fraudulent decisions.
No court, nor even any contractor, ever questioned that
GAO could obtain judicial review for the Government
simply by refusing to approve payment on a disputes

---

fact, however, the District Court not only did not refer to that
statute, it did not refer to any statute, nor even intimate that a statute
might be relevant. What the District Court did was use the phrase
"fraud or overreaching" as shorthand for the *Kihlberg* rule, the ju-
dicially created fraud exception to the finality of disputes decisions.
That usage is readily apparent from a glance at the District Court's
citations: *Mason & Hanger* and *Moorman* from this Court, and *Penn
Bridge, Carroll,* and *McShain Co.* from the Court of Claims.

The Court also says, *id.,* at 11, that in *James Graham* "summary
judgment was entered by the court, which said, 'Since the Navy
Department has determined that plaintiff contractor is entitled to
the payment sought, this Court must adjudge accordingly.'" The
Court omits to quote the immediately preceding sentence in the
*James Graham* opinion: "And the Navy Department's decision that
these particular dues and contributions are reimbursable is *not
arbitrary or unconscionable.*" 91 F. Supp., at 717 (emphasis added).
Thus, again, the District Court was referring to the *disputes decision,*
and not, as the Court today would have it, to "fraud or overreach-
ing" by the *contractor.*

decision favorable to a contractor. It was accepted by all that the Government and the contractor both were entitled to judicial review.[9] The problem that gave rise to the Wunderlich Act was not *who* was entitled to judicial review nor *how* judicial review was to be attained. The problem was the *scope* of judicial review.

As the Court noted in *United States* v. *Bianchi & Co.,* 373 U. S. 709, 713 (1963), under the *Kihlberg* rule a court's function "in matters governed by 'disputes' clauses was in effect to give an extremely limited review of the administrative decision"; the Court of Claims, however, had "somewhat expanded" the scope of judicial review "over the years." See, *e. g., Needles* v. *United States,* 101 Ct. Cl. 535, 601–607 (1944). It was this expansion of the scope of judicial review that *Wunderlich* addressed.

Certiorari was granted in *Wunderlich* "to clarify the rule of this Court which created an exception to the conclusiveness of such administrative decision[s]." 342 U. S., at 99. The Court gave a restrictive interpretation to this exception.

"Despite the fact that other words such as 'negligence,' 'incompetence,' 'capriciousness,' and 'arbi-

---

[9] The concurring opinion asserts that "[t]he contractor here, according to the long-term understanding of the disputes clause, consented to the disposition of disputes by the contracting officer and by the AEC on appeal, and to the finality of decision at those points." *Ante,* at 21. If the concurring opinion is speaking of pre-Wunderlich Act disputes clauses, the authorities I have cited establish the utter inaccuracy of the assertion. Indeed, the concurring opinion also asserts that "for years, *with the specified exceptions,* [the disputes] clause itself has been regarded as conferring no right of judicial review on the part of the Government." *Id.,* at 20 (emphasis added). The italicized words can only refer to the judicially created exception for fraudulent decisions. The concurring opinion gives no indication that, in either of the assertions, it is referring to the current disputes clause.

trary' have been used in the course of the opinions, this Court has consistently upheld the finality of the department head's decision unless it was founded on fraud, alleged and proved. So fraud is in essence the exception. By fraud we mean conscious wrongdoing, an intention to cheat or be dishonest. The decision of the department head, absent fraudulent conduct, must stand under the plain meaning of the contract." *Id.*, at 100.

Within a month after *Wunderlich* was decided, its restrictive scope of judicial review was applied against the Government. In *Leeds & Northrup Co.* v. *United States,* 101 F. Supp. 999 (ED Pa. 1951), the contractor, after a favorable disputes decision, was reimbursed for certain costs. Several years later, GAO reviewed that decision, disagreed with it, and set off the amount already paid from sums due the contractor on another contract. The contractor was therefore compelled to bring suit. The court first pointed out that GAO's power

"is subject to the rights of parties to a contract, including the Government, to provide for some designated person or persons, even if in the employ of one of the parties, to make a final determination of any question which may arise between them. This principle has been unequivocally declared by the courts, including the Supreme Court of the United States, in many cases." *Id.,* at 1002.

After quoting extensively from *James Graham,* the court stated the rule of judicial review as follows:

"The Bureau's determinations of questions of fact under [the disputes clause] are final and conclusive in the absence of fraud. United States v. Wunderlich. For a court to set aside such determinations under [the disputes clause], fraud, meaning conscious wrongdoing or an intention to cheat or be

dishonest, must be alleged and proved. United States v. Wunderlich." *Id.*, at 1003.

See also *Sunroc Refrigeration Co.* v. *United States,* 104 F. Supp. 131 (ED Pa. 1952), which, following *Leeds & Northrup,* also applied the *Wunderlich* scope of review against the Government.

## II

The *Wunderlich* opinion concluded, "If the standard of fraud that we adhere to is too limited, that is a matter for Congress." 342 U. S., at 100. Almost immediately after the decision was issued, congressional legislation was sought to expand the scope of judicial review limited by *Wunderlich* to "fraud" in a narrow sense. I have attached an Appendix detailing the legislative history and shall only summarize that history here.

Although several bills were introduced in the 82d Congress, congressional attention focused upon S. 2487. In its original form, S. 2487 provided:

"That no provision of any [Government] contract . . . relating to the finality or conclusiveness of any decision of the Government [official], in a dispute involving a question of fact arising under such contract, shall be construed to limit judicial review of any such decision only to cases in which fraud by such Government [official] is alleged."

*Wunderlich,* of course, construed the standard disputes clause, which purported to make disputes decisions final, to limit judicial review to instances of fraudulent decisions. S. 2487, then, was simply an acceptance of the invitation extended in *Wunderlich* itself. S. 2487, however, did not specify what the scope of judicial review would be, but merely directed that judicial review could not be limited to fraud. Moreover, there was no indication in the language of S. 2487 that it was over-

ruling *Wunderlich* only as to disputes decisions unfavorable to contractors. It obviously applied to the judicial review of *"any* such decision." (Emphasis added.)

The Comptroller General's initial report of GAO's views on S. 2487 made that abundantly clear. The report criticized *Wunderlich* as contrary to the interests of both the Government and contractors. Indeed, as a representative of the Government, the Comptroller General stressed *Wunderlich's* undesirable impact upon the Government's interest, for administrative "officials can make just as arbitrary determinations in favor of contractors, at the expense of the taxpayers." [10] And, as the Assistant Comptroller General put it in his testimony at the Senate hearings, *Wunderlich* "means that the decision of the administrative officials nearly always will be final because of the extreme difficulty of proving fraud." [11] Because the restricted scope of judicial review prescribed in *Wunderlich* applied to the Government no less than to contractors, GAO had good reason for its concern.[12]

GAO then offered a substitute bill that it believed would protect the Government's interests. The bill provided that a disputes clause decision

"shall not be treated as binding if the General Accounting Office or a court finds that the action of [the Government official] is fraudulent, arbitrary,

---

[10] Hearings on S. 2487 before a Subcommittee of the Senate Committee on the Judiciary, 82d Cong., 2d Sess., 6.

[11] *Id.,* at 8.

[12] It is misleading to assert, as does the Court, that *Wunderlich* "closed the courthouse doors to *certain citizens."* *Ante,* at 14 (emphasis added). Similarly, the concurring opinion asserts that *Wunderlich* "restricted *contractor*-instigated judicial review" and that the Government "prevailed" in *Wunderlich* with "a narrow judicial review standard for the *contractor."* *Ante,* at 22 (emphasis added). The concurring opinion's assertions are the more surprising in view of its apparent recognition that the Government was subject to the same standard of judicial review as contractors. See n. 9, *supra.*

capricious, grossly erroneous, or that it is not supported by substantial evidence."

GAO's substitute bill thus differed from S. 2487 in two respects. *First,* rather than merely reversing *Wunderlich,* it explicitly defined the expanded scope of review by specifying five grounds upon which a disputes decision could be set aside. Clearly this expanded review was to operate for both contractors and the Government, just as the "fraud" standard of review always had. It would be absurd to suppose that GAO defined the expanded scope of review only for contractors.

*Second,* GAO's substitute bill authorized GAO review in addition to judicial review. More precisely, it empowered GAO as well as the courts to set aside any disputes decision, whether favorable to the contractor or favorable to the Government. That was a significant expansion of S. 2487. GAO never previously was empowered to upset a disputes decision. Rather, GAO authority was always limited to refusing to sanction payment on a decision favorable to a contractor, thereby forcing him into court. At that point, of course, GAO's view of the merits of the disputes decision was irrelevant. Consequently, GAO's substitute bill, if enacted, would have increased GAO's power enormously, for it effectively authorized GAO to oust the courts of all jurisdiction to review disputes decisions that GAO considered unacceptable. Not surprisingly, this part of GAO's proposal became highly controversial.

Extended hearings on S. 2487 were held in the Senate. Although most of the witnesses and statements concerned themselves solely with urging expanded judicial review for contractors, without adverting to such review for the Government, there were notable exceptions. The Associated General Contractors took the position that judicial review must be available to both parties, as did

several attorneys who specialized in the representation
of contractors.[13]   Opponents of that view proposed bills
that would have expressly limited the right of judicial
review to contractors.[14]   The Comptroller General sub-
sequently submitted another report objecting to these
bills because their adoption would deprive the Govern-
ment of the defense of administrative finality while per-
mitting contractors "to utilize such defense should the
accounting officers of the Government attempt to ques-
tion the validity of a payment."[15]   It is significant that
no one ever suggested during the Senate hearings that
the expanded scope of review provided in S. 2487 and
GAO's substitute bill was to be available only for con-
tractors and not also for the Government.

An amended S. 2487 was reported out of Committee
following the hearings.[16]   It provided that no disputes
clause

> "shall be pleaded as limiting judicial review of any
> [disputes] decision to cases in which fraud by [the
> Government] official . . . is alleged."

Thus, amended S. 2487, like the bill in its original form,
contained an explicit reversal of the *Wunderlich* stand-
ard of judicial review.   Like the original bill, moreover,
amended S. 2487 gave not the slightest indication that
it was a command solely to the Government not to
"plead" the disputes clause as limiting the contractor's
right to judicial review.   Amended S. 2487 plainly di-

---

[13] Hearings on S. 2487, *supra*, n. 10, at 29–32, 68, 83–84, 107, 114.

[14] *Id.*, at 59, 107.   Moreover, H. R. 6301, also introduced in the
82d Congress, provided for judicial review only in those instances "in
which the contractor shall seek to set aside a decision on a disputed
question between the United States and such contractor, made by
an officer, board, or other representative of the United States . . . ."
Neither House supported this bill.

[15] Hearings on S. 2487, *supra*, n. 10, at 119.

[16] See S. Rep. No. 1670, 82d Cong., 2d Sess.

rected that no disputes clause could be pleaded to limit judicial review of *any* disputes decisions. Neither party, under amended S. 2487, could rely upon a disputes clause to limit the other party's right to judicial review to instances of fraudulent disputes decisions.

Amended S. 2487, however, went beyond the original bill by incorporating GAO's substitute bill:

> "[A]nd any such provision shall be void with respect to any such decision which the General Accounting Office or a court, having jurisdiction, finds fraudulent, grossly erroneous, so mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence."

Thus, amended S. 2487 reversed *Wunderlich,* adopted GAO's definition of the expanded scope of review, and authorized GAO as well as the courts to apply that expanded review and set aside *any* disputes decisions.

The Committee Report on amended S. 2487 expressly noted "that to the same extent [the *Wunderlich*] decision would operate to the disadvantage of an aggrieved contractor, it would also operate to the disadvantage of the Government in those cases, as sometimes happens, when the contracting officer makes a decision detrimental to the Government interest in the claim." [17] The reversal of *Wunderlich,* then, was clearly seen as an expansion of judicial review that would apply no matter which party, the Government or the contractor, challenged the disputes decision.

The report then explained that the addition of GAO's proposal meant that amended S. 2487 would

> "have the effect of permitting review in the General Accounting Office or a court with respect to any decision of a contracting officer or a head of an agency which is found to be fraudulent, grossly erroneous,

---

[17] *Id.,* at 2.

so mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence. In other words, in those instances where a contracting officer has made a mistaken decision, either wittingly or unwittingly, it will not be necessary for the aggrieved party to, in effect, charge him with being a fraud or a cheat in order to affect [*sic*] collection of what is rightfully due." [18]

Thus, the expanded scope of review, explicitly defined, would be available to both parties before either GAO or a court. In short, amended S. 2487 empowered a court to set aside a disputes decision at the behest of either the Government or the contractor, and, likewise, it empowered GAO to set aside a decision challenged by either party. Although the report asserted that amended S. 2487 was intended "simply to recognize the jurisdiction which the General Accounting Office already has," [19] in fact amended S. 2487 would have given GAO the entirely new power to make a binding review of disputes decisions. It would have made GAO, as was later charged, into a second court of claims.

Although the Senate passed amended S. 2487, the 82d Congress expired without House action. When it was reintroduced in the Senate of the 83d Congress,[20] Senator McCarran, the bill's sponsor, observed that the *Wunderlich* decision "cuts two ways" and, as an example, cited a case I have already discussed, *Leeds & Northrup Co.* v. *United States*, 101 F. Supp. 999 (ED Pa. 1951), in which "[t]he Comptroller General . . . attempted to recover on behalf of the Government, because the mistake was against the Government. The contractor interposed a

---

[18] *Ibid.*

[19] *Id.*, at 3.

[20] Amended S. 2487 was reintroduced as S. 24, but for ease of reference I will continue to refer to it as amended S. 2487.

defense based on . . . the Wunderlich case. . . . [T]he result was a failure of recovery on behalf of the Government." [21] Thus, Senator McCarran, like GAO, recognized that the narrow review permissible under *Wunderlich* bound both the Government and the contractor, and, like GAO, he considered that reversal of *Wunderlich* would also apply equally to both parties. A month later during floor debate, Senator McCarran again emphasized that while *Wunderlich* could "operate greatly to the disadvantage of contractors," it could also "operate to the disadvantage of the Government." [22] The Senate then passed the bill, obviously with the understanding that the expanded scope of judicial review provided would be available to both the Government and contractors.

Amended S. 2487 was also introduced in the House of the 83d Congress. [23] At the initial House hearing in July 1953, several witnesses asserted that enactment of the bill was essential to enable both the Government and contractors to obtain effective judicial review of disputes decisions. [24] Opposition then developed to the provision empowering GAO to invalidate such decisions. The objection was, quite predictably, that "[t]he effect of the provision is to set up the General Accounting Office as a 'court of claims.' . . . [A]n agency of the legislative branch . . . should not be used to perform functions intended for the judicial branch." [25]

Understanding the precise nature of this objection is important. No one suggested that amended S. 2487

---

[21] 99 Cong. Rec. 4573.

[22] 99 Cong. Rec. 6170.

[23] Amended S. 2487 was introduced as H. R. 1839, but for ease of reference I will continue to refer to it as amended S. 2487.

[24] Hearings on H. R. 1839 et al. before Subcommittee No. 1 of the House Committee on the Judiciary, 83d Cong., 1st and 2d Sess., ser. 12, at 3–20.

[25] *Id.*, at 26.

did not grant the Government the same scope of judicial review that it granted contractors. Obviously, since amended S. 2487 authorized both GAO and the courts to exercise the same review, and since the objection was that GAO should not be able to set aside disputes decisions favorable to contractors, it would have been absurd to suggest that amended S. 2487 did not likewise authorize the courts to set aside such decisions. Nor did anyone question the ability of GAO to obtain judicial review for the Government through its power to refuse to approve payment on disputes decisions. All agreed that the purpose of the proposed legislation was to overturn the standard of review set by *Wunderlich;* the narrow scope of judicial review permissible under that case was to be done away with in favor of a broader, specifically defined review. The purpose was to expand judicial review, not to insert further administrative review into the disputes process. Thus, the opposition urged, not unreasonably, that the avowed purpose of overruling *Wunderlich* would not be served by expanding GAO's power to transform it into another court. Hence, deletion of GAO from amended S. 2487 would leave the power of binding review exclusively with the courts.

The Comptroller General bowed to this opposition. Stating (erroneously, I think) that GAO "has not asked for authority which it did not have before the decision in the Wunderlich case," he offered another substitute bill deleting the objectionable provision. He asserted that "this substitute language will accomplish what we have been striving for all along and will place the General Accounting Office in precisely the same situation it was in before" *Wunderlich.*[26] This bill, in the form submitted by GAO with one minor addition, was enacted as the Wunderlich Act.

---

[26] *Id.,* at 136.

Thus, the result of GAO's attempt to obtain the power of binding review over disputes decisions was failure. That power was left where it was before the Act, solely with the courts. GAO simply retained the power it had always had, the power to force the contractor into court where the Government would get judicial review of the disputes decision in his favor.

The hearings resumed in January 1954. In urging passage of GAO's revised substitute bill, GAO's General Counsel stated that, despite deletion of the provision for binding GAO review, the bill would not only protect contractors but would also protect the Government "against decisions adverse to the interests of the United States. Certainly the rights of contract[ors] and the Government to review or appeal should be coextensive." [27] Similarly, the Associate General Counsel of the General Services Administration asserted that GAO's revised substitute bill was adequate to "insure an opportunity to protect the Government against excessive generosity," since GAO, under the bill, "could seek a court review by a set-off or by applying to the Department of Justice for recovery in a case where they felt that the action of the contracting officer was grossly erroneous as against the Government." [28]

Many witnesses who opposed GAO's original substitute bill, and thus opposed amended S. 2487, now supported GAO's revised substitute bill because it made clear that the power to set aside disputes decisions was vested exclusively in the courts and not shared by the courts with GAO. There was no suggestion from anyone that deletion of GAO from amended S. 2487 also had the effect of precluding the Government from obtaining judicial review under the standards available to contractors. Any

[27] *Id.*, at 39.
[28] *Id.*, at 59.

such suggestion would have been absurd, for, as noted above, amended S. 2487 granted the courts and GAO exactly the same power. In fact, at one point in the hearings, a witness objected that GAO's revised substitute bill did "not say specifically that an appeal can be taken by an aggrieved contractor." The ensuing colloquy with Committee members made plain that the language of the bill "necessarily include[d] both parties." [29] Moreover, as in the case of the Senate Committee, the House Committee was presented with a proposed bill that would have expressly limited the right of judicial review to contractors. [30] As with the Senate, that suggestion was not adopted. Instead, the Committee reported out the bill, submitted by GAO, that is now the Wunderlich Act.

The Act expanded the scope of judicial review, and that was all it did. The Committee report made that plain. "The committee foresees no possibility of the proposed legislation creating any new rights that a contractor may not have had prior to its enactment, with the exception of the standards of review therein prescribed." [31] Nor did the Act grant GAO new power, for, as the report said, "there is no intention of setting up the General Accounting Office as a 'court of claims.' " On the other hand, the Act did not diminish GAO's existing authority to hold up payment and force the contractor to bring suit, as the report also stressed. "The elimination of the specific mention of the General Accounting Office from the provisions of the bill as amended should not be construed as taking away any of the jurisdiction of that Office." [32] Thus GAO authority was left exactly where it was.

---

[29] *Id.*, at 110.

[30] *Id.*, at 89.

[31] H. R. Rep. No. 1380, 83d Cong., 2d Sess., 6.

[32] *Id.*, at 7.

A point I have already made about deletion of the reference to GAO bears repeating. Amended S. 2487, by incorporating GAO's original substitute bill, granted GAO precisely the same binding power of review that it granted the courts. Contractors did not object to that provision because it authorized GAO to set aside disputes decisions unfavorable to contractors. They objected because amended S. 2487 authorized GAO to set aside disputes decisions *favorable* to contractors. That power, opponents of amended S. 2487 urged, must be vested solely in the courts. They prevailed, and the reference to GAO was deleted. Deletion of the authority granted to GAO obviously could have no effect whatever on the identical authority granted to the courts.[33]

The Senate originally passed amended S. 2487 upon the clear understanding that the expanded scope of judicial review it contained would be available to both the

---

[33] The Court's only foray into the legislative history is its assertion that "Congress contemplated giving the General Accounting Office such powers and, indeed, the Senate twice passed—in the form of the McCarran bill—a provision which would have allowed the Comptroller to review disputes decisions to determine if they" satisfied the standards of the Act. *Ante,* at 11. The Court therefore concludes that the Act cannot be construed "to give the Comptroller General powers which Congress has plainly denied." *Id.,* at 12. Similarly, the concurring opinion asserts that "[t]he flat rejection by Congress of the proposed provision for GAO review is significant. There would be no point in that rejection if GAO has the power to defeat the finality of the disputes decision anyway." *Ante,* at 22–23. Unfortunately, the Court and the concurring opinion overlook that the proposed provision was not simply "for GAO review." It was for *binding* GAO review. Because it was not enacted, GAO does *not* "have a veto of AEC's 'final' decision," *ante,* at 9 (opinion of the Court); GAO does *not* have "power to defeat the finality of the disputes decision," *ante,* at 23 (concurring opinion). Both the Act and the disputes clause specifically provide that only a *court* can set aside a disputes decision. And that is precisely the point the legislative history makes clear.

Government and contractors. When the House bill came to the Senate after deletion of the GAO provision, Senator McCarran, who had previously stressed that *Wunderlich* hurt both the Government and contractors, explained that while the House bill differed from the bill passed by the Senate, since it deleted the authority to GAO, it was "designed to accomplish the same purpose." [34] That purpose, of course, was to overturn *Wunderlich* and to provide the courts with grounds of review in addition to fraud. The two bills could not, of course, "accomplish the same purpose" if the House bill authorized expanded judicial review only for contractors, leaving the Government either with the *Wunderlich* standard or with no review at all. After Senator McCarran responded affirmatively to the statement that the difference was only "a modification of the language in the Senate bill, and the two bills agree in their effect," [35] the Senate passed the House bill.

The text of the Act is its own witness to the congressional purpose. It provides that no clause in a Government contract purporting to make final an administrative determination of a dispute arising under the contract "shall be pleaded in any suit . . . as limiting judicial review." The proviso then defines the applicable scope of review.

It is impossible to read the plain words of this statute as directing that judicial review is available only for disputes decisions unfavorable to contractors. Indeed, the language is so clear that there should be no need to search through the legislative history for a contrary meaning.[36] That history, in any event, demonstrates that the Act means exactly what it says.

---

[34] 100 Cong. Rec. 5717.

[35] 100 Cong. Rec. 5718.

[36] The need arises in this case only because petitioner argues that, despite the clear language of the Act, the legislative history reveals that Congress meant to reserve the right of judicial review solely

Two significant considerations buttress my conclusion that the Court's construction of the Act is patently and grievously erroneous.

*First.* The bill that became the Wunderlich Act was a *Government* bill. As the Committee report said, the Act, with a minor exception, "is exactly the same legislation suggested by the Comptroller General."[37] GAO offered it as a substitute for the original S. 2487 because of *Government* concern that administrative "officials can make just as arbitrary determinations in favor of contractors, at the expense of the taxpayers."[38] The bill explicitly stated that the expanded scope of review would add to "fraudulent" the grounds that the disputes decision was "arbitrary," "capricious," "grossly erroneous," or "not supported by substantial evidence." After GAO modified the bill to delete the provision authorizing GAO review, in addition to court review, on those grounds, *Government* procurement agencies joined forces with GAO in strong support of passage. It is absurd to suppose that the *Government* pressed for a bill that granted *contractors* an expanded scope of judicial review, inserted in the bill by the *Government,* yet denied the *Government* judicial review on those same grounds.

*Second.* That absurdity is compounded by the consequences that result from interpreting the Act to deny

---

to contractors. It is thus somewhat odd that the Court considers it worthwhile to assert "that the Act's legislative history 'has something for everyone'" and that the Court "find[s] the Act's history at best ambiguous." *Ante,* at 13 n. 9. The concurring opinion likewise professes to find the legislative history "decidedly ambiguous at best," *ante,* at 22, yet nevertheless goes on to assert that Congress *"intended* to relieve *contractors"* and "opened the door to the *contractor," ibid.* (emphasis added). These comments are all the more inexplicable because neither the Court nor the concurring opinion attempts even the most cursory analysis of the text of the Act itself.

[37] H. R. Rep. No. 1380, *supra,* n. 31, at 6.
[38] See n. 10, *supra.*

the Government judicial review of disputes decisions. Before *Wunderlich,* the Government could challenge the finality of those decisions at least on the ground of fraud. If the Act affords only contractors judicial review and denies review to the Government, it follows that the Government has been deprived even of the right it had under *Wunderlich* to challenge "fraudulent" disputes decisions. The principal Government procurement agencies, now including the Atomic Energy Commission, have created contract appeals boards as the final level of agency review of disputes decisions. Because the Act expressly provides for judicial review of such "board" decisions, interpreting it to deny the Government review means that however "fraudulent," however "arbitrary," however "capricious," however "grossly erroneous," however clearly "not supported by substantial evidence" the board's determination, the procurement agency and the Government itself are helpless to redress the wrong. In this case, that might mean the loss of more than one million dollars to American taxpayers. But at stake are countless millions. To say that *Government* wrote and secured passage of a bill to work that result is preposterous.[39]

## III

So far as I can penetrate the Court's opinion, its primary premise is exposed by such sentences as these: "The purpose of avoiding 'vexatious litigation' would

---

[39] The concurring opinion asserts that "[i]n the exercise of its legislative judgment, Congress has determined that in this area the Government," unlike contractors, does not need the Act's protection "against fraud, capriciousness, arbitrariness, bad faith, and absence of evidence." *Ante,* at 23. As the concurring opinion never refers to the language of the Act, and finds the legislative history "not at all that clear," "decidedly ambiguous at best," *id.,* at 22, and "inconclusive," *id.,* at 23, it is difficult to understand the basis for this statement.

not be served, however, by substituting the action of officials acting in derogation of the contract." *Ante,* at 8.[40] "Neither the Wunderlich Act nor the disputes clause empowers any other administrative agency to have a veto of AEC's 'final' decision or authority to review it." *Id.,* at 9. "In other words, we cannot infer that by some legerdemain the disputes clause submitted the dispute to further administrative challenge or approval . . . ." *Ibid.* "Here, the AEC spoke for the United States and its decision, absent fraud or bad faith, should be honored." *Id.,* at 10.[41] "Since the AEC withheld payment solely because of the views of the Comptroller General and since he had been given no authority to function as another tier of administrative review, there was no valid reason for AEC not to settle with petitioner according to its earlier decision." *Ibid.*[42] "That action by the

---

[40] This statement, albeit obscurely, may mean that the purpose of avoiding litigation would not be served by subjecting a disputes decision in *favor* of the contractor to judicial review, for that would be litigation. Yet just as obviously the purpose of avoiding litigation would not be served by subjecting a disputes decision *against* the contractor to judicial review.

[41] See n. 4, *supra,* n. 43, *infra.*

[42] This is a difficult statement to understand. Assume that the Commission had "no valid reason" not to pay petitioner. Was the Commission's nonpayment in violation of the contract? Was it in violation of the Wunderlich Act? The Court does not say. If nonpayment violated neither the contract nor the Act, it seems rather strange that this Court should order the Commission to pay. The Court's statement appears to be connected with its later statement that "[t]he AEC has not, to this day, repudiated the merits of its decisions in favor of petitioner." *Ante,* at 19. Again, however, the Court does not say how or even whether the Commission's "nonrepudiation" violated the contract or the Act.

In the same vein, the concurring opinion asserts that there is "a possible breach of contract" in this case: "When the United States then disavows the Commission's decision—a decision which, as the Court notes, to this day has never been withdrawn or repudiated by the AEC—it seems to me that the Government imposes

Comptroller General was a form of additional administrative oversight foreclosed by the disputes clause." *Id.*, at 12. "[The Act] should not be construed to require a citizen to perform the Herculean task of beheading the Hydra in order to obtain justice from his Government." *Id.*, at 14. "We are reluctant to construe a statute enacted to free citizens from a form of administrative tyranny so as to subject them to additional bureaucratic oversight, where there is no evidence of fraud or over-reaching." *Id.*, at 14.[43] "This objective [preventing the inflating of bids] would be ill served if Government contractors—having won a favorable decision before the agencies with whom they contracted—had also to run the gantlet of the General Accounting Office and the Department of Justice." *Id.*, at 14–15.

The Court's *bête noire*, then, is primarily the General Accounting Office, with a sideswipe at the Department of Justice. We are left to infer, I gather, that Congress shared the Court's distaste for the activities of those agencies in these cases and enacted the Wunderlich Act, not only to arm contractors with expanded grounds of judicial review of disputes decisions favorable to the Government, but also, by the device of denying judicial review to the Government, to abolish the authority of GAO to disapprove payments to contractors under disputes decisions, thus forcing contractors to sue, and, by that device, to relieve the Department of Justice of any suits

---

something to which the contractor has not agreed." *Ante*, at 21, 22. The concurring opinion, however, does not say how the Government's "disavowal" violated the contract.

[43] If this statement implies that a contractor *is* "subject . . . to additional bureaucratic oversight, where there *is* . . . evidence of fraud or overreaching" (emphasis added), one might well ask why that is so. Fraud is only *one* of the five grounds of judicial review specified in the Act and the disputes clause. Obviously either all or none are available. See n. 4, *supra*.

to defend on behalf of the United States. There are three dispositive answers to the Court's supposition.

*First.* The notion that Congress enacted the Wunderlich Act to abolish the authority of GAO and the Department of Justice is completely a figment of the Court's own imagination. As the judicial history shows, both agencies have exercised for decades powers identical to those exercised in this case, with no prior complaints that I can discover and with complete congressional approval. I need only quote from the Committee report that accompanied the bill that is now the Wunderlich Act.

> "The proposed legislation, as amended, will not add to, narrow, restrict, or change in any way the present jurisdiction of the General Accounting Office either in the course of a settlement or upon audit, and the language used is not intended either to change the jurisdiction of the General Accounting Office or to grant any new jurisdiction, but simply to recognize the jurisdiction which the General Accounting Office already has.

> "The elimination of the specific mention of the General Accounting Office from the provisions of the bill as amended should not be construed as taking away any of the jurisdiction of that Office. *It is intended that the General Accounting Office, as was its practice, in reviewing a contract and change orders for the purpose of payment, shall apply the standards of review that are granted to the courts under this bill. At the same time there is no intention of setting up the General Accounting Office as a 'court' of claims.'* Nor should the elimination of the specific mention of the General Accounting Office in the bill be construed as limiting its review to the fraudulent intent standard prescribed by the Wunderlich decision.

*"The specific intent of this legislation, insofar as it affects the General Accounting Office, is explicitly stated in the letter . . . from the Comptroller General himself . . . ."*

The report then quoted from the Comptroller General's letter, in which he said that GAO "has not asked for authority which it did not have before the decision in the Wunderlich case," and in which he quoted from the Senate Committee's report on amended S. 2487:

"[I]t is not intended to narrow or restrict or change in any way the present jurisdiction of the General Accounting Office, either in the course of a settlement or upon audit; [it] is not intended either to change the jurisdiction of the General Accounting Office or to grant any new jurisdiction, but simply to recognize the jurisdiction which the General Accounting Office already has." [44]

*Second.* The case law detailed earlier in this opinion, including *Eaton, Brown & Simpson, Inc.* v. *United States,* 62 Ct. Cl. 668 (1926), in which GAO disagreed with a disputes decision in favor of the Government and paid the contractor, establishes without question that GAO has no power to overturn a disputes decision. The limit of its authority is to refuse to sanction payment to the contractor and thus force him to bring suit. The judicial precedents in this Court, the Court of Claims, and the district

---

[44] H. R. Rep. No. 1380, *supra,* n. 31, at 6–7 (emphasis added). This detailed refutation that GAO authority was being curtailed was necessary to allay the fears expressed by the attorney who argued *Wunderlich* for the contractor. He testified during the House hearings that deletion of GAO from amended S. 2487, passed by the Senate, might be misconstrued as depriving GAO of its prior authority to refuse to sanction payment and thereby "throw the matter into court." See Appendix, *infra,* at 78–80. Today's decision fulfills his prophecy.

courts are explicit that only a court can determine the merits of the dispute within the grounds of review specified by the Wunderlich Act. It is therefore completely irrelevant that "the AEC withheld payment solely because of the views of the Comptroller General." *Ante,* at 10. Indeed, the Court exposes the fallacy of its own position when it states that "the disputes clause in the contract says that the decision of the AEC is 'final and conclusive,' unless a *court* determines that the award is vulnerable under §§ 1 and 2 of the Act." *Id.,* at 3–4 (emphasis added). See also *id.,* at 9: "By the disputes clause the decision of AEC is 'final and conclusive' unless 'a *court* of competent jurisdiction' decides otherwise for the enumerated reasons." (Emphasis added.)

*Third.* Similarly, the Court states, in response to the Government's nonexistent contention that the Department of Justice has "the power to overturn decisions of coordinate offices of the Executive Department," *id.,* at 12, "That power [of the Department of Justice to defend suits against the United States] is pervasive but it does not appear how under the Wunderlich Act it gives the Department of Justice the *right to appeal* from a decision of the Atomic Energy Commission," *id.,* at 12–13 (emphasis added). See also *id.,* at 13: "The *power to appeal* to the Court of Claims a decision of the federal agency under a disputes clause in a contract which the agency is authorized to make is not to be found in the Wunderlich Act and its underlying legislative history." (Emphasis added.) No one suggests that the Department of Justice has a "right to appeal." It is involved in this case only because GAO's refusal to sanction payment forced petitioner to sue the United States, thus creating a lawsuit that the Department of Justice, as the Government's lawyer, had a duty to defend. It would be strange if the Department had a duty to confess judgment.

In support of its construction of the Act, the Court

makes a statement, which I have already quoted, that invites a further comment:

"[J]udicial review was provided so that contractors would not inflate their bids to take into account the uncertainties of administrative action. This objective would be ill served if Government contractors— having won a favorable decision before the agencies with whom they contracted—had also to run the gantlet of the General Accounting Office and the Department of Justice." *Id.,* at 14–15.

Contractor witnesses at the committee hearings asserted that contractors would have to inflate their bids if they could attack a disputes decision only on the ground that it was fraudulent. As the Court says, the Act resolved this problem by expanding the scope of judicial review, so that contractors can attack a disputes decision on grounds in addition to fraud. *That* was the protection Congress gave contractors so that they would not have to inflate their bids.

After recognizing this, the Court says that because contractors got expanded judicial review to prevent the necessity of inflating bids, they *also* got the benefit of not having decisions in their favor subject to judicial review *at all,* since otherwise the objective of preventing inflated bids "would be ill-served." It would be difficult to imagine a more obvious *non sequitur.* The Court could as easily say that "[t]his objective would be ill served" if the contractors ever lost a disputes decision.

I might add that the Court does not say that the "objective would be ill served" if favorable contractor decisions were subject to *judicial review;* it says that the "objective would be ill served" if contractors "had also to run the gantlet of the General Accounting Office and the Department of Justice." Yet what the Court means, of course, is judicial review, for neither GAO nor

the Department of Justice can take a favorable decision away from a contractor. Only a *court* can do that.

The Court is forced to go to extreme lengths to assert that the Government still may have relief for fraud. That is because the Court concedes, as it must, that its construction of the Act denying the Government judicial review forecloses review of disputes decisions that are "fraudulent," just as it forecloses judicial review of decisions that are "arbitrary," "capricious," "grossly erroneous," or "not supported by substantial evidence." The Court's attempted escape is to suggest that the Government may have relief for fraud under the statutes in which "Congress has made elaborate provisions for dealing with fraudulent claims of contractors." *Id.*, at 16. Apart from the absence of any explanation why, if statutory remedies were always available, this Court found it necessary to fashion, for Government and contractor alike, a judicial exception to the finality of disputes decisions, the point is frivolous.[45] Obviously the fraud statutes the Court mentions have no application whatever to the fraud we are discussing in this case.

The "fraud" that is an issue in a disputes clause case is *not* contractor fraud. Not one case construing a disputes clause, from 1878 to the present day, ever mentions "fraud" by the *contractor*. Nor has anyone ever sug-

---

[45] The Court asserts that "[i]f the Comptroller General has the broad, roving, investigatory powers that are asserted, specific statutory grants of authority such as this provision [41 U. S. C. § 53] relating to kickbacks would be superfluous." *Ante,* at 10 n. 8. The GAO authority asserted here, however, is simply the authority to refuse to sanction payment under a disputes decision on the ground that the decision does not satisfy the standards of the Wunderlich Act. The Act, of course, has nothing whatever to do with illegal activities of contractors. It concerns only the finality of administrative *disputes decisions.* Enforcement of the Act obviously would not make the statutory prohibition of kickbacks "superfluous."

gested that the Government needs judicial review of disputes decisions to guard against fraud by the *contractor*. The "fraud" that is involved is a *fraudulent decision*. The disputes clause and the Act itself provide judicial review to determine whether the *"decision . . . is fraudulent."* (Emphasis added.) When a disputes decision is challenged, the only questions concern that *decision:* was it "fraudulent"? was it "capricious"? was it "arbitrary"? was it "grossly erroneous"? was it "not supported by substantial evidence"?[46] The Court is absolutely right that "[a] contractor's fraud is of course a wholly different genus than the case now before us." *Id.,* at 15.

## IV

The time-tested standards of statutory construction require interpretation of the statutory wording to effect the congressional purpose as revealed by legislative history. The Court totally discards those standards in construing the Wunderlich Act. Instead, the Court purports to discover a nonexistent hostility of Congress toward the "intermeddling," *id.,* at 19, of GAO and the Department of Justice in the disputes process and for that reason a congressional purpose to prevent the subjection of "citizens . . . to additional bureaucratic oversight," *id.,* at 14. The virtually century-long judicial history that forms the background of the Act, its explicit language, and its clear legislative history completely refute the proposition. I dissent and would affirm the judgment of the Court of Claims.

---

[46] Even my Brother DOUGLAS once recognized this:

"We should allow the Court of Claims, the agency close to these disputes, to reverse *an official whose conduct* is plainly out of bounds whether *he* is fraudulent, perverse, captious, incompetent, or just palpably wrong." *United States* v. *Wunderlich, supra,* at 102 (dissenting opinion) (emphasis added).

APPENDIX TO OPINION OF BRENNAN, J.,
DISSENTING

Within two months after the decision in *United States*
v. *Wunderlich*, 342 U. S. 98 (1951), six bills to expand
the scope of judicial review of agency disputes decisions
were introduced.  S. 2432 (Sen. Chavez); S. 2487 (Sen.
McCarran); H. R. 6214 (Rep. Celler); H. R. 6301 (Rep.
Springer); H. R. 6338 (Rep. Wilson); H. R. 6404 (Rep.
Walter).  Hearings were held in the Senate on S. 2487.
Hearings on S. 2487 before a Subcommittee of the Sen-
ate Committee on the Judiciary, 82d Cong., 2d Sess.
(1952).  S. 2487 provided:

> "That no provision of any contract entered into by
> the United States, relating to the finality or con-
> clusiveness of any decision of the Government con-
> tracting officer, or of the head of the department or
> agency of the United States concerned or his rep-
> resentative, in a dispute involving a question of fact
> arising under such contract, shall be construed to
> limit judicial review of any such decision only to
> cases in which fraud by such Government contract-
> ing officer or such head of department or agency or
> his representative is alleged." *Id.*, at 1.

The Comptroller General's report to the Judiciary
Committee, setting forth GAO's views on S. 2487, stated
that GAO felt that the result of the *Wunderlich* decision
was "undesirable both as to the contractor's interests and
the interests of the Government." *Id.*, at 5–6.  The
Comptroller General stressed the latter interest.

> "I am as deeply concerned, however, that the rule
> allows the contracting officials uncontrolled discre-
> tion over the Government's contractual affairs as
> well and places them in a position to make as
> arbitrary and reckless use of their power against the

interests of the Government as against the interests of the contractor. In other words, deciding officials can make just as arbitrary determinations in favor of contractors, at the expense of the taxpayers." *Id.*, at 6.

The report concluded that GAO considered S. 2487

"inadequate and . . . objectionable because no provision is made therein for a review of decisions of administrative officers by the General Accounting Office. Without a provision to that effect the General Accounting Office in performing its statutory functions would be precluded from questioning the propriety or legality of payments made to a contractor as the result of an arbitrary or grossly erroneous decision on the part of the contracting officer." *Id.*, at 7.

The report recommended a substitute bill, which provided that

"Any stipulation in a Government contract to the effect that disputed questions shall be finally determined by an administrative official, representative or board shall not be treated as binding if the General Accounting Office or a court finds that the action of such officer, representative or board is fraudulent, arbitrary, capricious, grossly erroneous, or that it is not supported by substantial evidence." *Ibid.*

Frank L. Yates, the Assistant Comptroller General, expanded on the report in his testimony before the Subcommittee. He asserted that prior to *Wunderlich* disputes clause decisions on questions of fact arising under Government contracts "were not disturbed by the General Accounting Office or the courts unless the action of the administrative officer was fraudulent, arbitrary, capricious, grossly erroneous, or without foundation in fact."

*Wunderlich*, Mr. Yates said, "means that the decision of the administrative officials nearly always will be final because of the extreme difficulty of proving fraud." *Id.,* at 8. And, he continued, "the rule works both ways," for "[a] deciding administrative official can make decisions adverse to the Government as well as to contractors, in which event an improper decision results in a burden, an improper burden, to the taxpayers of the country." *Id.,* at 9. Thus, he said, "it appears that the executive contracting agencies without specific legislation authorizing them to do so, may, by agreement with the contractor, circumvent the operations of courts and the General Accounting Office to the serious detriment of both private business and the Government." *Id.,* at 9– 10. Mr. Yates explained that GAO's substitute bill would restore "to the courts and to the General Accounting Office . . . their normal and proper jurisdiction," for:

> "[I]t would permit [administrative officers] to make determinations on questions of fact which would have final effect if the decisions were not found by the General Accounting Office or the courts to be fraudulent, arbitrary, capricious, et cetera. Such a law not only would protect a contractor from fraudulent, arbitrary or capricious action by giving him, in addition to resort to the courts, a further administrative remedy before the General Accounting Office . . . but it would also provide a protection, through the General Accounting Office, against decisions adverse to the interests of the United States. Certainly the rights of contractors and the Government to review or appeal should be coextensive." *Id.,* at 11.

The managing director of the Associated General Contractors, H. E. Foreman, testified that the construction industry had for many years attempted without success to secure changes in the standard disputes clause. The

industry's latest proposed disputes clause, which Mr. Foreman read at the hearing, provided "[t]hat nothing in this contract . . . shall void the right of either party to this contract carrying the dispute before a court of competent jurisdiction." *Id.,* at 24. The association's general counsel, John C. Hayes, stated that its position was "that any decision made by a contracting officer or head of a department, agency, or bureau, should be subject to judicial review, in order to guarantee that such decision is reasonable, made with due regard to the rights of both the contracting parties, and supported by the evidence upon which such decision was based." *Id.,* at 29. In amplifying on this position, Mr. Hayes testified that only "by permitting judicial review of the contracting officer's decision . . . can the rights of both the contracting parties be protected." Although he then referred to the need for legislation that would authorize the courts to "enter judgment against the United States on any claim in which the contractor shall seek a review" of a disputes decision, he immediately added that the legislation should provide "that any provision in any contract with the United States abridging the right of the parties to court review shall be null and void." *Id.,* at 30. Finally, in commenting on GAO's proposed substitute bill, Mr. Hayes said that the association "would welcome further administrative review," but that contractors also "should be permitted our judicial review, whether it be the government or whether it be the contractor, it doesn't make any difference. It has to cut both ways . . . ." *Id.,* at 31. Replying to a specific question, Mr. Hayes denied that judicial review "was a one-way street in favor of the contractor," repeating that "it cuts both ways." He concluded that the association wished "to take the position of being absolutely fair in urging legislation that will protect the rights of both Government and contractor." *Id.,* at 32.

There was much discussion of GAO's substitute bill and GAO's role in the review of agency disputes decisions. A former counsel to the Comptroller General, O. R. McGuire, testified that GAO's review should be limited to questions of law and that GAO should "accept the facts, unless, of course, there is fraud, or just gross mistake." *Id.*, at 41. John W. Gaskins, who was on the brief for Wunderlich in the Supreme Court, proposed a revision of GAO's substitute bill specifically granting both GAO and the courts "jurisdiction to set aside any [administrative] decision" that did not comport with the standards set out in GAO's bill. *Id.*, at 68. Gardiner Johnson, an attorney who specialized in the representation of contractors, testified that, as he understood GAO's position, GAO "simply wanted practically the same right that the contractors are requesting, to take an appeal from what they consider to be an unfair and unreasonable decision." *Id.*, at 84. As so understood, he said, "our people have no basic quarrel with that. We are against all forms of unfair, unreasonable decisions either against the Government and the taxpayer or against the contractor." *Id.*, at 83.

Most of the witnesses and most of the submitted statements, however, were concerned only with protecting contractors. *E. g., id.*, at 2–3, 62, 70–75, 85–87, 119–136. A few witnesses went even further. Robert E. Kline, Jr., an attorney representing the National Association of River and Harbors Contractors, proposed amendments to S. 2487 designed "to assure full restoration to Government contractors of their inherent right to judicial review of unjust decisions by Government contracting officers and department heads." *Id.*, at 58. These amendments specifically limited the legislation to contractors' suits in which a court would "enter judgment against the United States." *Id.*, at 59. Alan Johnstone, an attorney representing a contractor, initially suggested that the legisla-

tion "should provide . . . simply that all administrative determinations in the performance of a contract with the United States shall be subject to review by the Comptroller General and by the courts, according to law, the provisions of any such contract to the contrary notwithstanding." *Id.,* at 61–62. Mr. Johnstone returned to testify later and, although expressing a preference for a "bill mak[ing] justiciable any grievance which either of the parties to the contract would have," submitted two proposed bills on behalf of himself, Mr. McGuire, and Mr. Gaskins, both of whom had already testified, and Harry D. Ruddiman, who subsequently testified at the House hearings. These proposals made judicial review available only to contractors, one providing that "the United States shall not employ as a defense the finality of" agency decisions, the other that "the United States shall not avail itself of the defense of the finality of such decision[s]." *Id.,* at 107.

In contrast, the Associated General Contractors, adhering to the position its representatives had taken at the hearings, submitted a resolution adopted at its annual convention stating that any disputes decision "should be subject to judicial review, in order to guarantee that such decision is reasonable, made with due regard to the rights of both the contracting parties, and supported by the evidence upon which such decision was based," and urging legislation that would provide "that any provision in any contract with the United States abridging the rights of the parties thereto to court review shall be null and void." *Id.,* at 114.

After the hearings concluded, the Comptroller General sent the Committee a copy of his report to the Chairman of the House Judiciary Committee dealing with the House bills. *Id.,* at 116–119. This report reiterated many of the comments made in the Comptroller General's earlier report to the Senate Committee. The re-

port also objected to the two proposed bills, submitted by Mr. Johnstone, limiting judicial review to contractors on the ground that "the Government would be precluded from employing the finality of the administrative decision as a defense to a suit, [while] the contractors would be free to utilize such defense should the accounting officers of the Government attempt to question the validity of a payment made to a contractor." The report, as did the prior one, recommended adoption of GAO's substitute bill. *Id.*, at 119.

S. 2487 was reported out in amended form, incorporating the substance of GAO's proposal. As amended, S. 2487 provided

> "That no provision of any contract entered into by the United States, relating to the finality or conclusiveness, in a dispute involving a question arising under such contract, of any decision of an administrative official, representative, or board, shall be pleaded as limiting judicial review of any such decision to cases in which fraud by such official, representative, or board is alleged; and any such provision shall be void with respect to any such decision which the General Accounting Office or a court, having jurisdiction, finds fraudulent, grossly erroneous, so mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence. . . ." S. Rep. No. 1670, 82d Cong., 2d Sess., 1 (1952).

The Committee report stated that "[t]he purpose of the proposed legislation is to overcome the inequitable effect, under a recent Supreme Court decision, of language in Government contracts which makes the decision of the contracting officer or the head of the agency final with respect to questions of fact." *Ibid.* The report pointed out "that to the same extent [the *Wunderlich*] decision

would operate to the disadvantage of an aggrieved contractor, it would also operate to the disadvantage of the Government in those cases, as sometimes happens, when the contracting officer makes a decision detrimental to the Government interest in the claim." *Id.*, at 2. The report further explained that:

> "S. 2487 will have the effect of permitting review in the General Accounting Office or a court with respect to any decision of a contracting officer or a head of an agency which is found to be fraudulent, grossly erroneous, so mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence. In other words, in those instances where a contracting officer has made a mistaken decision, either wittingly or unwittingly, it will not be necessary for the aggrieved party to, in effect, charge him with being a fraud or a cheat in order to affect [*sic*] collection of what is rightfully due." *Ibid.*

Finally, the report stressed that amended S. 2487 was "not intended to narrow or restrict or change in any way the present jurisdiction of the General Accounting Office . . . but simply to recognize the jurisdiction which the General Accounting Office already has." *Id.*, at 2–3.

Although the Senate, without debate, passed amended S. 2487, 98 Cong. Rec. 7783–7784; *id.*, at 9059, the House did not act upon it during the 82d Congress. It was reintroduced in the Senate of the 83d Congress as S. 24. The Committee report was, with formal changes, identical to the report on amended S. 2487. S. Rep. No. 32, 83d Cong., 1st Sess. (1953). Senator McCarran, the bill's sponsor, explained on the floor that the effect of the *Wunderlich* decision was to require "that the aggrieved party allege and prove that some Government employee deliberately cheated, or intended to defraud

him, in order to get a court review of the question."
99 Cong. Rec. 4572. He also noted that:

> "Senators who have looked into this matter know
> that this decision of the Supreme Court cuts two
> ways. It can hurt the Government badly, as well
> as doing an injustice to contractors. In a recent
> case . . . [t]he Comptroller General . . . attempted
> to recover on behalf of the Government, because the
> mistake was against the Government. The con-
> tractor interposed a defense based on . . . the Wun-
> derlich case. . . . [T]he result was a failure of re-
> covery on behalf of the Government.
>
> "It was because of this case . . . that the Comp-
> troller General . . . testified before the Judiciary
> Committee in behalf of this bill." *Id.*, at 4573.

Later the same day, however, Senator McCarran stated
that the Air Force "objected to the fact that the bill
gave the Comptroller General the same right that was
given to a contractor to question a decision of a contract-
ing officer." *Id.*, at 4598. He also stated that "the
Comptroller General feels that in order to protect the
interests of the Government, it is necessary that he shall
have as much right to question the decision of a contract-
ing officer . . . as may be given to the private party to
the contract." *Id.*, at 4599. When S. 24 reached the
floor a month later, Senator McCarran again emphasized
that while the *Wunderlich* decision could "operate greatly
to the disadvantage of contractors," it could also "oper-
ate to the disadvantage of the Government." *Id.*, at
6170. The Senate then passed the bill. *Id.*, at 6201.

Representative Reed introduced amended S. 2487 in
the House as H. R. 1839, and hearings were held on it
and two related bills, H. R. 3634 (Rep. Celler) and H. R.
6946 (Rep. Willis). Hearings on H. R. 1839 et al. be-
fore Subcommittee No. 1 of the House Committee on

the Judiciary, 83d Cong., 1st and 2d Sess., ser. 12 (1953, 1954).

At the initial hearing in July 1953, all witnesses supported the bill. Elwyn L. Simmons, a contractor, asserted that, because of "incompetent or negligent or capricious agency representative[s]," the *Wunderlich* decision could "work as readily against the Government's interests as against that of the contractor" and that "only your immediate legislative action through enactment of H. R. 1839 or S. 24 can now protect both the Government and the contractor from this . . . unprecedented situation." *Id.,* at 4. Referring to the Senate debates on S. 24, Mr. Simmons noted

> "that there was some objection by contractors doing business with the Air Force to the inclusion of the GAO under the provisions of this bill. I do not know what basis these Air Force contractors have for their objection, but we as general contractors are used to the GAO in our business and their auditing staff and forms no basis for our objection." *Id.,* at 5.

George P. Leonard, an officer of the Wunderlich Contracting Co., testified that because of *Wunderlich* "neither the Government through the GAO, nor the contractors through the courts, have any right to appeal from contracting officers' decisions even though they may be grossly erroneous." *Id.,* at 7. He added that he saw "no reason why anybody should object to either the General Accounting Office or the courts passing on these decisions of the contracting officers." *Id.,* at 8.

Harry D. Ruddiman, who argued for Wunderlich before the Supreme Court, submitted a prepared statement asserting that unless H. R. 1839 was enacted, "not only the contractor but also the Government, will be unable to obtain effective judicial review of contracting officers' decisions." In his view, H. R. 1839 "would restore to

the courts an effective review of determinations made by contracting officers." *Id.*, at 12. Although, in light of the Senate reports on amended S. 2487 and S. 24, Mr. Ruddiman discounted "[f]ears . . . that the reference to the General Accounting Office in S. 24 would give it powers with respect to the review of payments under Government contracts beyond those which it already possesses," he suggested in his statement that "any doubt on the matter . . . can very easily be removed by striking out the words 'the General Accounting Office or' " in H. R. 1839. *Id.*, at 13. In his testimony, however, Mr. Ruddiman expressed reservations about removing GAO from the bill.

> "Lastly, I would like to deal with an objection which has been raised to including the General Accounting Office in the provisions of this bill. I don't know just exactly what the basis of the objection is, but in my opinion, any fears along that line are groundless. As I see it, the General Accounting Office, as a matter of practice, in reviewing contracts and change orders for purposes of payment, is always going to apply the standards of review that are granted to the courts. That has been their practice before the Wunderlich decision. They figured if there was good reason to doubt the finality of the decision, the matter ought to be referred to the courts. I think that is all that would be done by the language of this bill.

> "At one time I thought there would probably be no objection to striking out the reference to the General Accounting Office as mentioned in S. 24 or H. R. 1839. I felt that even if you had no reference, the General Accounting Office would still exercise that same jurisdiction. However, in view of the fact that the Senate has already passed a bill which has included a reference to the General Ac-

counting Office, I think it would be dangerous now to eliminate the General Accounting Office from the provisions of this bill. It might be misconstrued as taking away this jurisdiction from the General Accounting Office." *Id.*, at 16.

Representative Graham, a committee member, replied that it was "needless to refer to" GAO anyway. *Ibid.* Mr. Ruddiman, however, adhered to his view in a letter to the Subcommittee the following day.

"I feel that if the bill, as passed by the Senate, had contained no reference to the General Accounting Office, and the House of Representatives had passed such a bill without amendment, the General Accounting Office as a practical matter would, in reviewing payments under Government contracts and change orders, employ these same standards of review that are granted by the bill to the courts. Thus, if the General Accounting Office was confronted with an administrative decision which it thought would be set aside by the courts, it would refuse to make payment and throw the matter into court. However, since the Senate, in passing S. 24, has expressly included the General Accounting Office in the bill, some doubt as to the General Accounting Office jurisdiction might arise if the House of Representatives should then strike out all reference to the General Accounting Office. There would then be the possibility that this action would be construed as limiting review by the General Accounting Office to the ineffective ground of fraudulent intent prescribed by the Wunderlich decision. It is therefore my suggestion that the bill be passed without change in the language employed by the Senate." *Id.*, at 17.

Alan Johnstone, the final witness of the day, likewise

urged that GAO be left in H. R. 1839. *Id.,* at 18. He said that "this bill would throw wide the portals of the courts of justice to anyone, including the Government, which has a grievance," and, referring, as had Senator McCarran, to *Leeds & Northrup Co.* v. *United States,* 101 F. Supp. 999 (ED Pa. 1951), in which a contractor successfully asserted a *Wunderlich* defense, he said "that what is sauce for the goose is sauce for the gander." *Id.,* at 19.

Opposition to H. R. 1839 was also becoming apparent. Among the letters sent to the Committee, *id.,* at 22–30, all calling for legislation to protect the rights of contractors, was one urging deletion of the reference to GAO because "[t]he effect of the provision is to set up the General Accounting Office as a 'court of claims.' . . . [A]n agency of the legislative branch . . . should not be used to perform functions intended for the judicial branch." *Id.,* at 26.

Shortly before the hearings resumed in January 1954, the Comptroller General wrote the Chairman of the Committee about H. R. 1839. He noted that "there was considerable opposition to the bill from some quarters . . . on the basis . . . that the General Accounting Office should not be given express authority by statute to review and overrule the determinations of administrative officials." *Id.,* at 135. He responded that GAO "has not asked for authority which it did not have before the decision in the Wunderlich case," and he referred to the statement in the Senate reports that the bill would not affect GAO's jurisdiction. Nevertheless, he then presented a substitute bill, to which he said there would be little or no opposition by industry groups and administrative agencies. He stated that "this substitute language will accomplish what we have been striving for all along and will place the General Accounting Office in

precisely the same situation it was in before" *Wunderlich.
Id.*, at 136. GAO's proposed bill provided:

> "That no provision of any contract entered into by
> the United States, relating to the finality or con-
> clusiveness of any decision of the head of any depart-
> ment or agency or his duly authorized representative
> or board in a dispute involving a question arising
> under such contract, shall be pleaded as limiting
> judicial review of any such decision to cases where
> fraud by such official or his said representative or
> board is alleged: Provided, however, that any such
> decision shall be final and conclusive unless the same
> is fraudulent or capricious or arbitrary or so grossly
> erroneous as necessarily to imply bad faith, or is
> not supported by substantial evidence. . . ." *Ibid.*

With the addition of the words "in any suit now filed or
to be filed," added to deal with retroactivity problems,
see, *e. g., id.*, at 48, 82, GAO's bill eventually was enacted
as the Wunderlich Act.

In commenting upon GAO's bill, E. L. Fisher, GAO's
general counsel, reiterated much of the testimony of the
Assistant Comptroller General, Mr. Yates, at the Senate
hearing. Mr. Fisher, as had Mr. Yates, stressed that the
*Wunderlich* "rule works both ways. A deciding admin-
istrative official can make decisions adverse to the Gov-
ernment as well as to contractors." *Id.*, at 38. Mr.
Fisher, in language virtually identical to that earlier used
by Mr. Yates, urged passage of either H. R. 1839 or
GAO's proposed substitute because they

> "would permit [administrative officers] to make de-
> terminations on questions of fact which would have
> final effect if the decisions were not found by the
> General Accounting Office or the courts to be fraud-
> ulent, arbitrary, capricious, and so forth. Such a
> law not only would protect a contractor from fraud-

ulent, arbitrary or capricious action by giving him, in addition to resort to the courts, a further administrative remedy before the General Accounting Office, and would also provide a protection, through the General Accounting Office, against decisions adverse to the interests of the United States. Certainly the rights of contract[ors] and the Government to review or appeal should be coextensive." *Id.*, at 39.

The associate general counsel of the General Services Administration, J. H. Macomber, Jr., similarly emphasized the need to protect the Government's interests, stating "that there should be some provision in the legislation, if not an explicit provision at least by appropriate wording with respect to the judicial review portion, that will insure an opportunity to protect the Government against excessive generosity, against decisions of the contracting officer adverse to the Government." *Id.*, at 59. Mr. Macomber suggested that

"there might be some doubt under the wording of H. R. 6946 . . . where specific reference is made to a finding by the court[,] as to whether the General Accounting Office could seek a court review by a setoff or by applying to the Department of Justice for recovery in a case where they felt that the action of the contracting officer was grossly erroneous as against the Government. I think that the language suggested by the Comptroller General's revision gets away from that difficulty." *Ibid.*

Mr. Simmons, a contractor who had supported H. R. 1839 at the initial hearing, appeared again to support GAO's substitute bill on the ground that it "was prepared to meet objections of certain industries against giving the General Accounting Office express statutory authority to review administrative decisions under the disputes

clause, and is designed to give the General Accounting Office no more authority in this connection than it had before the Wunderlich decision." *Id.,* at 76.

Many other witnesses supported GAO's substitute bill on essentially the same grounds. *E. g., id.,* at 52–56, 77–88, 91–95, 101–104, 123–124. Louis F. Dahling, associate counsel for the Automobile Manufacturers Association, asserted that H. R. 1839 would "make the General Accounting Office another Court of Claims" and thus deprive contractors of their day in court.

"Now, it does not appear from the language in that bill that there would be any appeal from a decision of the General Accounting Office, and that office will in all probability make the first review of any disputes clause decision. If that agency should decide that the decision was not supported by substantial evidence, it would appear that the contractor would have no redress. Furthermore, the General Accounting Office is a part of the legislative department of the Government. . . . If this agency is made another Court of Claims, in a sense it becomes a judge and jury and a prosecutor." *Id.,* at 97.

Mr. Dahling therefore supported GAO's bill because it did "not grant judicial power to the General Accounting Office." *Id.,* at 98. Charles Maechling, Jr., a representative of the Radio-Electronics-Television Manufacturers Association, echoed this view.

"Under S. 24, however, the scope and powers of the General Accounting Office are vastly enlarged, and this agency of the Government, which has heretofore exercised principally investigatory and audit functions, becomes clothed with powers of a judicial nature. S. 24 appears to set up the General Accounting Office as a third administrative tier of review in Government contract disputes." *Id.,* at 105.

Similarly, the American Merchant Marine Institute submitted a statement objecting to H. R. 1839

"in so far as it establishes the General Accounting Office as a sort of intermediate or 'floating' court and vests it with express statutory authority to set aside [an administrative] decision merely because its administrative officers in their opinion consider the decision not to be supported by substantial evidence. On the other hand, we fully agree that a decision of a contracting officer or, upon appeal, of the head of the contracting agency, should be subject to judicial review and reversal by the courts . . . . This judicial function, however, should not be shared with or otherwise vested in the General Accounting Office . . . . The literal effect of S. 24 appears to be that once the General Accounting Office may have found the decision to be not supported by substantial evidence, it may not thereafter be pleaded in court either by the contracting party or the Government as limiting the scope of judicial review to that provided for by the disputes clause." *Id.,* at 122.

Opposition to H. R. 1839, then, was premised on the fear that its reference to GAO might deprive contractors of any recourse to the courts. That judicial review was the contractors' sole concern is also clear from the position taken by the Associated General Contractors, *id.,* at 61–75, which supported H. R. 1839 on the ground that it would restore to contractors "the fundamental right of judicial review of disputes arising under Government contracts." *Id.,* at 62.

That deletion of the reference to GAO was not understood as denying judicial review to the Government becomes evident from an examination of Representative Willis' testimony about his bill, H. R. 6946, which was identical to H. R. 1839 except that it omitted the words "the General Accounting Office or." *Id.,* at 31. He tes-

tified that the "Wunderlich decision could react and has reacted unfavorably to the Government where the Government felt it was the aggrieved party." *Id.*, at 32. The following colloquy then occurred:

"Mr. HYDE. The only question that occurred to me was that you mentioned there might be a time when the Government was the aggrieved party. With the present procedure, the Government is not likely to be the aggrieved party?

"Mr. WILLIS. It could be. It could very well be, because here you are dealing with fraud, and the court says that in order to have relief one must be guilty of fraud. Now, a contracting officer who hands down a decision against the Government can very adversely affect the Government itself, and the Government some of these days might find a decision very much against itself. The decision works both ways, in that there is no appeal either way from the holding of the contracting officer unless a showing of fraud is made, and the Government itself might be caught some of these days under this Wunderlich decision. I know of one case when the court so ruled.

.        .        .        .        .

"Mr. HYDE. If the contracting officer makes a finding, under what circumstances would the Government be the one to take an appeal or want to take an appeal? Who would be the one in the Government to say, 'We are going to take an appeal'?

"Mr. WILLIS. I imagine the General Accounting Office would be interested, and the Department of Justice and the Department of Defense. Suppose a dispute arises . . . [a]nd then on matters of fact the contracting officer holds one way. Then neither side has recourse unless there is a showing that the

contracting officer was dishonest, was guilty of fraud, or intended to cheat someone." *Id.*, at 33–34.

This testimony is significant also in light of the later testimony of Franklin M. Schultz, a former law professor who had written about the problems created by the *Wunderlich* decision. Mr. Schultz expressed concern that GAO's substitute bill did "not say specifically that an appeal can be taken by an aggrieved contractor." A committee member then asked whether the language of GAO's bill did "not necessarily include both parties." *Id.*, at 110. The following colloquy ensued:

"Mr. SCHULTZ. Yes, and that is exactly my point. . . . [S]everal years from now, if the Comptroller General decides . . . that a contracting officer's decision is not supported by substantial evidence, he could refuse payment, and in a court action he could say that this bill means that it is a two-way street, not only may the contractor upset the contracting officer for not having substantial evidence behind the decision, but in the case where the contracting officer makes a decision favorable to the contractor the GAO has similar upsetting power. . . .

.           .           .           .           .

"Mr. WILLIS. This judicial review referred to in that passage there referring to a review by GAO, when GAO has been left out deliberately as compared to S. 24?

"Mr. SCHULTZ. Well, that is persuasive, sir, but you do have the testimony of Mr. Fisher, sponsoring [GAO's] bill . . . saying that the rights of contractors and the Government to appeal should be coextensive. . . ." *Id.*, at 110–111.

Mr. Schultz went on to say, what was implicit in the above colloquy, that his objection was not to judicial

review for the Government, which he recognized would be available, but to judicial review for either the Government or contractors on the basis of the "substantial evidence" test. He indicated that his "own preference would be for the language of [GAO's] bill without the phrase 'substantial evidence,' " *id.*, at 113, and in a subsequent letter to the Subcommittee he again suggested that neither the Government nor contractors should be permitted to rely upon that standard to upset an administrative decision, *id.*, at 118–119.

The Subcommittee was presented with, but took no action upon, a bill proposed by the American Bar Association that would have expressly limited the right of judicial review to contractors. *Id.*, at 89. Instead, the Committee reported out the bill that is now the Wunderlich Act. H. R. Rep. No. 1380, 83d Cong., 2d Sess. (1954). The report stated:

> "The purpose of the proposed legislation . . . is to overcome the effect of the Supreme Court decision . . . under which the decisions of Government officers rendered pursuant to the standard disputes clauses in Government contracts are held to be final absent fraud on the part of such Government officers.
> ". . . The proposed legislation also prescribes fair and uniform standards for the judicial review of such administrative decisions in the light of the reasonable requirements of the various Government departments and agencies, of the General Accounting Office and of Government contractors." *Id.*, at 1–2.

The report also discussed the effect of the legislation on GAO, in much the same terms as had the prior Senate reports.

> "The proposed legislation, as amended, will not add to, narrow, restrict, or change in any way the present

jurisdiction of the General Accounting Office either in the course of a settlement or upon audit, and the language used is not intended either to change the jurisdiction of the General Accounting Office or to grant any new jurisdiction, but simply to recognize the jurisdiction which the General Accounting Office already has.

"The elimination of the specific mention of the General Accounting Office from the provisions of the bill as amended should not be construed as taking away any of the jurisdiction of that Office. It is intended that the General Accounting Office, as was its practice, in reviewing a contract and change orders for the purpose of payment, shall apply the standards of review that are granted to the courts under this bill. At the same time there is no intention of setting up the General Accounting Office as a 'court of claims.' Nor should the elimination of the specific mention of the General Accounting Office in the bill be construed as limiting its review to the fraudulent intent standard prescribed by the Wunderlich decision." *Id.*, at 6–7.

Representative Graham stated on the floor of the House that the Comptroller General had approved the bill, and the House passed it without debate. 100 Cong. Rec. 5510. When the bill came to the Senate, Senator McCarran explained that

"The purpose of the proposed legislation is to overcome the inequitable effect, under the decison of the Supreme Court in the Wunderlich case, of language in Government contracts which makes the decision of the contracting officer or the head of the agency final, with respect to questions of fact. To put it another way, the objective of this bill is to preserve the right of review by the courts in cases

involving action by a contracting officer which is arbitrary, capricious, fraudulent, or so grossly erroneous as necessarily to imply bad faith.

"The language of the House bill, while quite different from the language approved in the Senate, is designed to accomplish the same purpose. It is my understanding the Department of Justice takes the view that the House language will accomplish the same purpose as the Senate language. It is my further understanding that the Comptroller General of the United States has expressed complete satisfaction with the House language, and has declared that in his opinion it will accomplish the purposes sought to be served by the Senate language." *Id.*, at 5717.

After Senator McCarran further assured the Senate that GAO was "satisfied with the language in the House bill" and that "otherwise [he] would not care to go along," *ibid.*, a final colloquy occurred:

"Mr. THYE. As I understand, the bill was passed by the Senate, and a similar bill was passed by the House. The only question involved is a modification of the language in the Senate bill, and the two bills agree in their effect, so to speak?

"Mr. McCARRAN. That is correct.

"Mr. THYE. There is nothing else of a legislative nature involved. Is that correct?

"Mr. McCARRAN. That is correct." *Id.*, at 5718.

The Senate then passed the bill. *Ibid.*